UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Cortec Corporation, a Minnesota corporation,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Erste Bank der oesterreichischen Sparkassen AG (Erste Bank), an Austrian corporation,<br><br>　　　　　　Defendant. | Civil Action No. 07 Civ. 6094 (CM) (DFE)<br><br>**Electronically Filed**<br><br><br>**DECLARATION OF BORIS MIKSIC** |

Boris Miksic hereby declares and certifies as follows:

**A.　Background**

1.　I am the President of Cortec Corporation, a Minnesota company. I also serve as an officer and member of the management board of EcoCortec, a company organized under the laws of the country of Croatia. I have dual citizenship in both the United States and Croatia. A true and correct copy of my resume is attached as Exhibit A to this declaration.

2.　I founded Cortec in 1977. Cortec is in the business of manufacturing, marketing, and selling anti-corrosion chemicals, films, and packaging products that protect the surfaces of metallic objects against corrosion. Cortec primarily sells its products through a worldwide network of distributors and through its own sales offices in China, Germany, Russia, and the United States. In some instances, Cortec sells products directly to customers through the use of its own sales contracts. Those direct sales are typically made to customers with large volume requirements, including 3M Company, General Motors, Hitachi, NASA, and the United States military.

3.     Biodegradable anti-corrosion films and bags are some of Cortec's fastest growing products. Cortec generates significant revenues from the sale of its biodegradable anti-corrosion film products in Europe, where Cortec has experienced a significant increase in demand for these products. Cortec's business plan shows European market demand for its biodegradable anti-corrosion film products in the range of $200,000,000.00 per year.

4.     EcoCortec was formed in 2004 to manufacture biodegradable anti-corrosion films in Croatia to be sold by Cortec worldwide. EcoCortec sought to design and build an extrusion facility in Beli Manastir, Croatia (the "Extrusion Facility"). The Extrusion Facility would manufacture specific types of anti-corrosion films, which EcoCortec would then sell to Cortec pursuant to a contract between the two companies. Cortec would then re-sell those products directly to its customers, or to its distributors for eventual sale to customers. EcoCortec's obligation to manufacture products and sell them to Cortec is set forth in a December 5, 2005, agreement between those two entities. That contract granted EcoCortec a license to manufacture Cortec's proprietary products and also required EcoCortec to supply Cortec with the products Cortec needed to re-sell to its own customers. According to Article VI of that agreement, EcoCortec agreed to "sell to [Cortec], at a competitive market price, the Products covered in this Contract at the request of Licensor." The purpose of the contract between EcoCortec and Cortec was to permit EcoCortec to manufacture Cortec's products, on the one hand, and to require EcoCortec to sell those products to Cortec in the amounts Cortec needed, on the other. A true and correct copy of the December 5, 2005, contract between EcoCortec and Cortec is attached as Exhibit B.

**B.     EcoCortec's Contacts with Erste Bank Croatia and Erste Bank AG**

5.      To finance the construction of the Extrusion Facility, I began in 2005 to search for a so-called Tier I bank with the capability to provide adequate financing. A Tier I bank was necessary because the Extrusion Facility to be constructed in Beli Manastir would be located in a "Croatian Free Zone." Such zones were established across Croatia in the aftermath of the Homeland War (1991-1995) to spur economic redevelopment in war devastated areas by providing incentives to businesses willing to invest in the local economy. Because EcoCortec's Extrusion Facility would be located in such a zone, financing was available through the Croatian Bank for Reconstruction and Development (the "CBRD Program"). Financing through that program required that an applicant locate a Tier I bank to participate in the transaction. My understanding is that a Tier I bank refers to the core measure of a bank's financial strength from a regulator's point of view, and requires the highest level of capital assets.

6.      In my search for a bank to participate in the CBRD program, I acted on behalf of both Cortec and EcoCortec, as those two companies both had an interest in securing the financing needed to construct the Extrusion Facility. Because of that shared interest, I communicated to all prospective banks, including Erste Bank der oesterreichischen Sparkassen AG ("Erste Bank AG") and its agent Erste & Steiermärkische Bank ("Erste Bank Croatia"), the joint interest of Cortec and EcoCortec in obtaining funds to build the Extrusion Facility. Specifically, during my meetings with Erste Bank Croatia, I explained that EcoCortec would manufacture the anti-corrosion films at the Extrusion Facility, sell them to Cortec, and that Cortec would then re-sell them to Cortec's customers and/or distributors. That business model was the basis for my discussions with each bank with whom I spoke. In fact, I provided a copy of EcoCortec's business plan to Erste Bank Croatia. A true and correct copy of that business

plan, which explains in detail the nature of the relationship between Cortec and EcoCortec, is attached as Exhibit C. I met with at least five Tier I banks to discuss the proposed project, each of which was a large multinational bank with its headquarters located outside Croatia.

7. Eventually, I met with representatives of Erste Bank Croatia to discuss the possibility of providing financing for the EcoCortec Extrusion Facility. I understood that Erste Bank Croatia acted as an agent of the much larger Erste Bank AG, with headquarters in Vienna, Austria. I explained to Erste Bank Croatia that Cortec and EcoCortec required the participation of a Tier I bank to comply with the requirements of the CBRD Program. Erste Bank Croatia assured me that it was sufficiently capitalized pursuant to the CBRD criteria because of its association with Erste Bank AG (a Tier I bank) and the Erste Bank group as a whole. To support that assertion, Erste Bank Croatia provided me with Erste Bank AG's annual report, which Erste Bank Croatia described as its own annual report. Erste Bank Croatia provided me with that annual report to persuade me to choose Erste Bank Croatia, acting as Erste Bank AG's agent, to provide financing for the EcoCortec Extrusion Facility. To the best of my recollection, Erste Bank Croatia provided me with a copy of Erste Bank AG's 2005 annual report. Upon information and belief, a true and correct copy of the 2005 annual report is attached as Exhibit K to the Affidavit of Josip Cicek.

### C. Representations Made to Cortec

8. Erste Bank AG's annual report holds Erste Bank Croatia out as an agent of the larger Erste Bank group, and as a direct agent of Erste Bank AG. Through the annual report, Erste Bank AG represented to Cortec and EcoCortec that Erste Bank AG had 1,546 employees located in Croatia. I understood that statement to mean that the employees of Erste Bank Croatia are actually considered employees of Erste Bank AG, the principal in the relationship between

the two banks. That representation was consistent with the representation that Erste Bank AG serves more than 600,000 customers in Croatia. (Page 62). Again, Erste Bank AG by its own admission serves those customers through Erste Bank Croatia, its agent, as Erste Bank AG itself evidently does not operate any branches in Croatia. Instead, Erste Bank AG does business in Croatia through its agent Erste Bank Croatia, as reflected in the annual report.

9. Erste Bank AG acquired Erste Bank Croatia in 2003. Erste Bank AG's Annual Report makes clear that:

> What really sets our acquisition policy apart is our post deal integration expertise. The restructuring and integration process typically starts after the day of signing. A service agreement gives Erste Bank experts immediate access, so that they can familiarize themselves with day-to-day operations of the bank right away. Following closing of the transaction, a tried and tested transformation programme is put in place and executed by a multinational transformation team, led by a senior Erste Bank executive. It typically lasts no longer than 18 months and covers all material aspects of the business. In sensitive areas, such as risk management, existing staff are immediately assisted by Erste Bank staff in order to upgrade the function to group standards as quickly as feasible. As a result of our highly developed regional expertise and our positive acquisition track record, we will continue to grow our regional franchise both through carefully selected acquisitions that fit the existing network, and organically.

(Page 22). I understood that passage to mean that, upon acquisition, Erste Bank AG would take responsibility for overseeing the operations of the banks it acquired, and that those banks would operate as Erste Bank AG's agents. I would not have selected Erste Bank Croatia to serve as EcoCortec and Cortec's financial partner in this transaction had I not believed Erste Bank Croatia to be an agent of the much larger Tier I bank, Erste Bank AG.

10. Before selecting Erste Bank Croatia as the bank to provide financing to EcoCortec, I met with Lidiya Balog. Ms. Balog was employed by Erste Bank Croatia as the branch manager for Osijck, the region in which the Extrusion Facility was to be constructed.

Ms. Balog represented to me that Erste Bank Croatia did not have authority to approve a loan to EcoCortec or Cortec. Instead, Ms. Balog would take EcoCortec's loan application and submit it to Erste Bank AG in Vienna for its approval. As Ms. Balog explained, everything had to be approved by Erste Bank AG in Vienna before funds could be issued to EcoCortec. I understood from that conversation that Erste Bank Croatia required the approval of its principal before entering into a loan agreement with EcoCortec, as Erste Bank Croatia was merely the agent of the Austrian bank.

### D. Erste Bank AG's Knowledge of Cortec's Contracts

11. EcoCortec applied for a loan with Erste Bank AG through its agent Erste Bank Croatia in March 2006. EcoCortec's loan application made clear the business relationship between EcoCortec and Cortec. Specifically, the application stated that the borrowed funds would be used to construct and operate an anti-corrosion film extrusion plant that would sell products to Cortec. According to EcoCortec's application, "the company's principle activity is the production of polyethylene films and biodegradable foils, which has been an activity for a number of years in the company of one of the investors, CORTEC Corporation from St. Paul, Minnesota, USA. The investor shall, in addition to the long-term agreement on licensed manufacture in Croatia, start the production and distribution of licensed and patented products of the company CORTEC & Co., with the purpose of supplying the constantly expanding European market." EcoCortec also supplied Erste Bank Croatia with a copy of its detailed business plan, which fully sets forth the business relationship between EcoCortec and Cortec, including the agreement between those two entities that EcoCortec would supply Cortec with products for resale. A copy of EcoCortec's loan application is attached as Exhibit B to the Cicek Affidavit.

At the time EcoCortec applied for its loan then, Erste Bank Croatia knew that Cortec had an agreement with EcoCortec that required EcoCortec to supply products to Cortec for resale.

12.     EcoCortec further informed Erste Bank Croatia through its loan application that "Ecocortec do.o.o.'s main buyers are its main distributors (distribution network of Cortec & Co. in Europe), who resells the products to the end users…" (Cicek Aff., Ex. B). Erste Bank AG thus knew at the time EcoCortec applied for a loan that the loan proceeds would be necessary to permit EcoCortec to supply products to Cortec, and in turn for Cortec to meet its obligations to its own customers and distributors. In fact, Erste Bank Croatia required EcoCortec to submit copies of exemplar agreements between Cortec and its distributors as part of EcoCortec's loan application. True and correct copies of the type of distributor agreement provided by EcoCortec to Erste Bank Croatia are attached as Exhibit D. I do not recall which precise distributor agreements EcoCortec provided as part of its loan application, but I can testify that the agreements attached as Exhibit D are of the type provided to Erste Bank Croatia.

13.     Erste Bank AG and Erste Bank Croatia recognized the role to be played by Cortec when Erste Bank Croatia approved the loan. As Erste Bank Croatia explained in the portion of the final loan application that it completed:

> The Bank gave its positive opinion on the loans' end user Ecocortec d.o.o., even though it is a start-up company, but it has taken into account its direct relationship with the foreign company Cortec Corporation, MN, USA, which is the leading producer of anticorrosive products with many years of experience in business and much expertise. The business strategy of Cortec Corporation includes construction of a new plant in Croatia, in which the existing KNOW-HOW and an already established distribution network of Cortec & Co., will be used, through which the sale for the entire European market will be directed.

(Cicek Aff., Ex. B).

14.     While EcoCortec's loan application was pending, I scheduled a meeting with Ms. Bolog's supervisor, Mr. Krajina. When I arrived for that meeting, Mr. Krajina was concluding a

meeting with a member of Erste Bank AG's board of directors. Mr. Krajina introduced me to that individual, who then told me that he was aware of EcoCortec's proposed project. He elaborated that he had just discussed EcoCortec's loan application with Mr. Krajina and that he looked forward to working with me and EcoCortec on the Extrusion Facility. I understood that statement to mean that Erste Bank AG had given its approval to Erste Bank Croatia to proceed with the proposed loan. In fact, when the EcoCortec facility was completed, someone placed a large "Erste Bank" banner outside the facility. Notably, that banner did not refer to Erste Bank Croatia, but instead referenced the larger Erste Bank group. True and correct copies of photographs taken of the EcoCortec facility with the banner outside are attached as Exhibit E.

15. Because Erste Bank AG discussed EcoCortec's loan application with Erste Bank Croatia, Erste Bank AG necessarily knew of the existence of an agreement between EcoCortec and Cortec for EcoCortec to supply Cortec with products, as well as the ongoing business relationship between those two parties. Erste Bank AG also had notice of Cortec's contracts with its distributors and customers, as those facts are laid out in the loan application and EcoCortec's business plan.

16. Erste Bank AG and Erste Bank Croatia further required Cortec to guarantee the loan issued to EcoCortec. By requiring that corporate guaranty, the two banks acknowledged the close business relationship between EcoCortec and Cortec, EcoCortec's largest customer. A true and correct copy of the corporate guaranty agreement is attached as Exhibit F to the Cicek Affidavit.

E. **Cortec has Suffered Damages as a Result of the Tortious Actions of Erste Bank AG and its Agent Erste Bank Croatia**

17. On or about March 8, 2007, Erste Bank Croatia notified EcoCortec that it had decided to prematurely terminate the loan agreement and call due the full amount of the loan

immediately. Erste Bank Croatia has never provided any viable explanation for its conduct. EcoCortec has offered on several occasions to cure whatever default Erste Bank Croatia believes has occurred, but Erste Bank Croatia has failed to respond to such offers. In fact, Erste Bank Croatia has refused even to provide EcoCortec with a payoff amount for the loan, so that EcoCortec might repay Erste Bank Croatia in full, as EcoCortec has also offered to do. In the absence of any contractual basis for its actions, it is clear that Erste Bank Croatia has called the loan due for improper reasons.

18. Erste Bank AG and Erste Bank Croatia caused serious damage to Cortec's business by prematurely calling due the loan to EcoCortec. Erste Bank AG knew that the very purpose of the loan was to permit EcoCortec to build a plant sufficient to manufacture the films it had agreed by contract to supply to Cortec. It also knew that this loan constituted the only source of financing for EcoCortec. By demanding immediate repayment of the full loan amount, Erste Bank AG and Erste Bank Croatia placed immense economic pressure on EcoCortec, and eventually forced EcoCortec to violate its agreement with Cortec as EcoCortec was not able to supply the films to Cortec that it was contractually required to supply. As a result of EcoCortec's breach of contract, Cortec was forced to obtain those films from other suppliers at great cost to Cortec.

19. Moreover, due to the loss of EcoCortec's films, Cortec itself was unable to timely fill orders it had received from its own distributors and customers. Attached as Exhibit F are true and correct copies of samples of order confirmations sent by Cortec to specific customers, along with invoices later sent to those customers. As shown by those documents, Cortec was unable to ship products to those customers by the date on the order confirmation form, due to Cortec's inability to obtain those products from EcoCortec. The premature termination of the loan thus

interfered with Cortec's contract with EcoCortec and Cortec's contracts with Cortec's distributors and customers. Erste Bank AG and Erste Bank Croatia knew of both sets of contracts at the time they unlawfully called due the loan.

**F.    Cortec Will Not Receive a Fair Trial in Croatia**

20.    I have been active in Croatian politics since 1995, when I was appointed as an Honorary Consul General of Croatia. In fact, in 2005, I organized a populist campaign and ran for the presidency of Croatia. During that election, I campaigned widely across the country and ultimately received more than 17% of the popular vote. That percentage garnered me third place in the presidential balloting.

21.    After the 2005 election, I was elected to the City Council in Zagreb, Croatia. I am currently a candidate for Croatia's Parliament.

22.    During the 2005 campaign, one of my key initiatives was to fight corruption in the Croatian political establishment. I also advocated for the domestic, rather than foreign, ownership of businesses and business assets, including the domestic ownership of banks. The type of legislation I advocated would help to prevent multinational banks such as Erste Bank AG from acquiring Croatian banks and using them as fronts for their own activities in Croatia.

23.    During my current campaign for Parliament, I have continued to emphasize the issue of foreign ownership of Croatian companies. I have made it clear that, if elected to Parliament, I intend to conduct an investigation into the acquisition of several large Croatian entities by foreign investors. Those entities include banks such as Erste Bank Croatia, which has been acquired by Erste Bank AG. I believe that Erste Bank AG's acquisition of Erste Bank Croatia was unlawful.

24.  The 2005 presidential election was beset by allegations of fraud and corruption. As a result, I appealed the results of that election to Croatia's Constitutional Court. I later appealed further to the European Court of Human Rights, where my case is still pending today. After the election was concluded, Croatia's new President fired the Minister of Justice. That official later publicly stated that more than 500,000 improper ballots had been counted in favor of the new President. True and correct copies of media accounts of the 2005 election are attached as Exhibit G. Those accounts that appeared in the Croatian media have been translated from Croatian to English. The original Croatian documents, together with a certificate of proper translation, are included within this exhibit.

25.  Because of my prominent role in Croatian politics, I have personally been the subject of numerous attempts to discredit me. Those attempts have also extended to efforts to interfere with my businesses.

26.  I have been the target of two assassination attempts in Croatia, in late 2004 and early 2005. Threats to my life and the general level of hostility directed toward me by Croatia's authorities, including its courts, have been well-documented in the Croatian press. True and correct copies of articles in the Croatian media that have addressed this topic are attached as Exhibit H. The original Croatian documents, together with a certificate of proper translation, are included within this exhibit.

27.  It is apparent that neither I nor Cortec will receive a fair trial in the Croatian judicial system. The European Union has recognized that the Croatian judicial system is not independent and is beset by corruption. Attached as Exhibit I is a true and correct copy of the Commission of the European Communities 2006 Progress Report for Croatia. Croatia is in the

process of applying for membership in the European Union. Before it can be admitted, however, it must comply with the EU's various requirements, as set forth in the Commission Report.

28. The 2006 Progress Report recognizes that Croatia continues to lack an independent judiciary, and is instead faced with a judiciary that is in many instances corrupt. As the Commission concluded just last year, "reform is at an early stage and the judicial system continues to suffer from severe shortcomings…Croatia is still some way from enjoying an independent, impartial, transparent and efficient judicial system…" (Report, p. 8).

29. The Report continues by concluding that "the main shortcomings with respect to the need for impartiality of the judicial system continues to be risk of corruption and the undue influence of particular economic and other interests." (Report, p. 48). Most troubling, the Report explains that:

> Overall, corruption continues to be a serious problem in Croatia that affects various aspects of society. Public perception of corruption has actually deteriorated over the past year. There has been no successful prosecution of any high-profile case to date. General tolerance of petty corruption appears to be widespread. Corruption in Croatia is aided by a lack of good governance, transparency and accountability in public administration and by a lack of ethics codes and codes of conduct in the public and private sectors.

(Report, p. 51).

Specifically, the Commission has noted special problems of corruption arising from "coalition-building following the 2005 local elections." (*Id.*).

30. Transparency International has also released a report criticizing Croatia's judicial system. That report explains that Croatia's citizens recognize judicial corruption as one of the most serious problems facing the country. According to that report:

> Public opinion surveys suggest that Croatians regard the judiciary as one of the most corrupt sectors in the country. Surveys by TI Croatia also indicate a perception of high levels of corruption in the judiciary. In a survey in 2003, 80 per cent of respondents answered positively when asked: 'Do you think corruption is widespread in the judiciary?'

A true and correct copy of relevant portions of the Transparency International, Global Corruption Report 2007 is attached as Exhibit J.

31. The Croatian press has also documented the problem of corruption in the judicial system. True and correct copies of articles describing that corruption are attached as Exhibit K. The original Croatian documents, together with a certificate of proper translation, are included within this exhibit.

32. Given the corruption inherent in the Croatian judicial system and the personal animus of many Croatian politicians to Cortec and myself, it is my belief that Cortec would not receive a fair trial in Croatia with respect to the claims it has brought in this case.

### G.  EcoCortec is Willing to Consent to Jurisdiction Before this Court

33. As stated above, I am an officer and member of the management board of EcoCortec and authorized to make decisions on behalf of that company. For purposes of resolving Cortec's claims as brought in this case, and for that purpose only, EcoCortec will voluntarily submit itself to the jurisdiction of this Court and consent to being joined as a party to this case, if this Court deems such joinder necessary to resolve Cortec's claims.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on this 30th day of October, 2007.

*[signature]*

Boris Miksic

GP:2277717 v3