# EXHIBIT D

# DISTRIBUTION AGREEMENT



AGREEMENT dated as of March 14, 2000 between CORTEC CORPORATION, a Minnesota Corporation, with its executive offices at 4119 White Bear Parkway, St. Paul, Minnesota 55110, U.S.A. ("Company"), and Interface Technologies, a company in France located at 51, rue Deleuvre, 69004 Lyon, France (the "Distributor").

## RECITALS

The Company manufactures and sells the Products listed on its current distributor price list, which is attached as Exhibit A to this Agreement (the "Products").

The Company desires to establish the Distributor as an authorized distributor of the Products in the Territory (as defined below) upon the terms and subject to the conditions set forth in this Agreement, and the Distributor desires to be so established.

## AGREEMENT

In consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1.  APPOINTMENT AND TERRITORY. The company hereby appoints the Distributor, during the term of this Agreement and upon the terms and conditions herein set forth, an authorized distributor of the Products for France (the "Territory"). In connection with such appointment, the Company hereby grants to Distributor, subject to the terms and conditions of this Agreement, the following rights:

(a)    To purchase Products from the Company for resale in the Territory;

(b)    To purchase such promotional materials and sales aids as may be made available by the Company to Distributor and to use, or to make available to its dealers, such promotional materials and sales aids in connection with sale and resale of Products.

(c)    To identify Distributor as an independent authorized distributor of Products in or on stationery, forms, or other materials, office signs, vehicles, telephone directory listings and advertising matter used in the promotion, distribution, sale and resale of Products. This right does not extend permission to Distributor to use the Company's trademarks, trade names and trading styles in Distributor's corporate or trade name. Each use by Distributor of the Company's trademarks shall identify the Company as the owner of the trademarks.

# DISTRIBUTION AGREEMENT

AGREEMENT dated as of _____, 2000 between CORTEC CORPORATION, a Minnesota Corporation, with its executive offices at 4119 White Bear Parkway, St. Paul, Minnesota 55110, U.S.A. ("Company"), and Interface Developpement, a/k/a _____, a company in France located at 51, rue Deleuvre, 69004 Lyon, France (the "Distributor").

## RECITALS

The Company manufactures and sells the Products listed on its current distributor price list, which is attached as Exhibit A to this Agreement (the "Products").

The Company desires to establish the Distributor as an authorized distributor of the Products in the Territory (as defined below) upon the terms and subject to the conditions set forth in this Agreement, and the Distributor desires to be so established.

## AGREEMENT

In consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1.     <u>APPOINTMENT AND TERRITORY</u>.    The company hereby appoints the Distributor, during the term of this Agreement and upon the terms and conditions herein set forth, an authorized distributor of the Products for France (the "Territory").  In connection with such appointment, the Company hereby grants to Distributor, subject to the terms and conditions of this Agreement, the following rights:

(a)     To purchase Products from the Company for resale in the Territory;

(b)     To purchase such promotional materials and sales aids as may be made available by the Company to Distributor and to use, or to make available to its dealers, such promotional materials and sales aids in connection with sale and resale of Products.

(c)     To identify Distributor as an independent authorized distributor of Products in or on stationery, forms, or other materials, office signs, vehicles, telephone directory listings and advertising matter used in the promotion, distribution, sale and resale of Products.  This right does not extend permission to Distributor to use the Company's trademarks, trade names and trading styles in Distributor's corporate or trade name.  Each use by Distributor of the Company's trademarks shall identify the Company as the owner of the trademarks.

2.    GENERAL DUTIES OF THE DISTRIBUTOR.

(a)    The Distributor shall use its best efforts to promote, create a demand for, distribute and sell the Products throughout the Territory.

(b)    Distributor agrees to maintain an adequate office and storage facility in the Territory for conduct of the business and for safe storage of Products. The Distributor shall refrain, outside the Territory, from seeking customers for the Products, from establishing any branch and from maintaining any distribution depot for the Products.

(c)    The Distributor may repackage the Products only as follows:

(i) The Distributor may repackage the Products in smaller containers than the containers in which Products are shipped to the Distributor by the Company.

(ii)    If the Company supplies Products to the Distributor in concentrate form, the Distributor may dilute or thin the concentrated Products locally in order to provide Products suitable for sale to local customer. All such dilutions or thinning agents must be approved by the Company and in accordance with the Company's written specifications. At the Distributor's request, the Company will test solvents or thinning agents at the Company's expense, but the Company disclaims all liability or responsibility to the Distributor for diluting or thinning done by the Distributor or for any damages to or claims of third parties claimed to have been caused by Products that were diluted or thinned by Distributor or for any damages to or claims of third parties claimed to have been caused by Products that were diluted or thinned by Distributor, regardless of whether such testing has been performed by the Company.

(iii)    The Distributor shall not re-label or otherwise alter the packaging of any non-repackaged Products except that the Distributor may add a statement that the Products are products of THE CORTEC CORPORATION distributed in the Territory by the Distributor. As to repackaged Products, labels shall be substantially the same as the labels provided by the Company on the Products except as to the descriptions of quantity or concentration and except that the Distributor may add a statement that the Products are products of THE CORTEC CORPORATION, distributed in the Territory by the Distributor. Distributor agrees to make any changes in the labels of repackaged Products that are requested from time to time by the Company.

(d)    The Company's trademarks that may be used on the Products and the packaging are the exclusive property of the Company, and the use of those trademarks on the goods and packaging and the goodwill arising therefrom shall inure to the benefit of the Company. Distributor agrees not to take any action detrimental to the validity of the Company's trademarks or their ownership by the Company or to the goodwill of the Company related to such marks. In

connection with the foregoing, Distributor agrees to use such trademarks only in connection with the Products and only in such form and manner as may be prescribed or permitted by the Company. Distributor also agrees to discontinue use of such trademarks, or to cause any of his dealers to discontinue use of such trademarks, upon receipt of written notice from the Company that, in the opinion of the Company, use of such trademarks by Distributor or by such dealer is injurious to the Company's rights, privileges and immunities as owner of such trademarks. Distributor will not claim any rights in any trademarks of the Company that the Company may use on the Products or their packaging or put in issue either the validity of those trademarks or the ownership by the Company of those trademarks. The Distributor shall not become or in any way be deemed to be the express or implied assignee of any trademark rights of the Company or any of its affiliates by reason of any of the rights granted to Distributor under this Agreement.

(e)     The Distributor agrees to conduct its operations in strict compliance with all applicable laws, ordinances, and regulations, to obtain all necessary permits and licenses, to pay all taxes, debts and other liabilities when due and in all respects to operate in a fair, ethical and lawful manner, and not to engage in any business practices which may reflect adversely upon the public image of the Company, its Products or its trademarks and the goodwill related thereto.

(f)     From time to time at the Company's request, the Distributor shall furnish, by airmail to the Company, a list of customers for the Products and the amount of purchases by each such customer for the period from the period covered by the Company's last request to the most recent month end, to the extent that such information is known to the Distributor.

3.     SALE OF PRODUCTS.  The Company shall sell to the Distributor, and the Distributor shall purchase from the Company, all Products which the Distributor requires for resale. The Company shall offer the Distributor the opportunity to distribute any newly developed products for temporary corrosion protection that are manufactured or sold by the Company from time to time, which products, if accepted for distribution by the Distributor, shall be listed on an amended distributor price list to be provided to Distributor by the Company and shall thereupon be deemed to be Products for the purposes of this Agreement.

4.     PRICES AND TERMS OF SALE.

(a)     The Products shall be sold to the Distributor at the prices shown on the Company's distributor price list in effect on the date the order is placed. Terms of sale shall be as provided in this Agreement, or if not provided in this Agreement, as shown on such distributor price list. The Distributor will be notified in writing a minimum of 30 days prior to the effective date of any change in prices or terms of sale. Payment terms shall be as shown on Exhibit B to this Agreement.

(b)     The Distributor's orders of Products, promotional materials and sales aids will be effective only when accepted by the Company by issuance of a written sales acknowledgment. The Company reserves the right at any time to change the design of Products and to change the

design of, add or withdraw promotional materials and sales aids. The Company shall not be liable for delay in furnishing any Product or other item because it is temporarily out of stock or has been discontinued or for any other reason.

(c)      All Products are sold F.O.B. the Company's facility. Title to the Products (and risk of loss) shall pass to the Distributor when the Products are delivered to the carrier at the Company's facility. The Distributor shall be responsible for importation of the Products into the Territory and for all freight charges, VAT, customs duties and the like in connection with the transport or import of the Products.

5.      NON-COMPETITION AND CONFIDENTIALITY.

(a)      The Distributor acknowledges that during the term (as hereinafter defined) the Company and its affiliates may disclose to the Distributor valuable confidential information and technology relating to the Products and will assist the Distributor in gaining market expertise in Products. The Distributor agrees that during the Terms and at all times thereafter, neither the Distributor nor any of its owners, officers or personnel shall disclose to any third party any information imparted to it by the Company or any of its affiliates which the Distributor knows or has reason to believe to be a trade secret or otherwise confidential. The Distributor acknowledges that the Company considers its specifications for diluting or thinning concentrated Products to be confidential information. The Distributor shall be fully responsible to the Company for any non-compliance with the provisions of this subsection (a) by any of the Distributor's owners, officers or personnel to the extent that compliance by such persons is enforceable under the laws of France.

(b)      Company acknowledges that during the term of this Agreement Distributor and/or its customers may disclose to Company valuable information and technology relating to Distributor's business. Company agrees during the Terms and at all times thereafter, neither the Company nor any of its owners, officers, or personnel shall disclose to any third party any information imparted to it by Distributor or any of Distributor's affiliates or customers which Company knows or has reason to believe to be a trade secret or otherwise confidential.

(c)      Except as provided below, during the Term of this Agreement, the Distributor shall not, either directly or indirectly, manufacture or distribute any goods which compete with any of the Products unless the Distributor has obtained the Company's prior written consent, which the Company may grant or withhold at its discretion.

6.      TERM.

(a)      The term ("Term") of this Agreement shall commence on the date first above written (the "Effective Date") and continue until two years after the Effective Date (the "Initial Term"), and, unless terminated under this Section 6 or under Section 7 below, the Term shall be renewed thereafter for an additional one-year period ("Renewal Term") if (i) the Minimum Sales Volume for the Products agreed to between the Company and the Distributor with respect to the Initial Term has been fulfilled by the Distributor, and (ii) prior to the conclusion of the  Initial

Term, the Minimum Sales Volume for Products for the Renewal Term has been agreed to in writing by the Company and the Distributor. The Minimum Sales Volume for the Products for the Initial Term is annexed hereto as Exhibit C and incorporated herein by reference.

(b)     If the Minimum Sales Volume for the Initial Term and the Minimum Sales Volume for the Renewal Term shall have been fulfilled by the Distributor, and if this Agreement shall not have been terminated under Section 7(a), then Distributor shall have the option to distribute the Products for three additional one-year periods provided (i) prior to the commencement of each such one-year period, the Minimum Sales Volume for Products for such period has been agreed to in writing by the Company and the Distributor and (ii) the Minimum Sales Volume for the Products for all periods prior to such additional one-year period has been fulfilled. The Distributor may exercise such option for each additional one-year period by providing written notice to the Company during the year preceding such additional one-year period.

7.     TERMINATION.  Either party may terminate this Agreement upon 90 days prior written notice if the other party commits a breach of any of the terms and conditions of this Agreement. Failure to pay any indebtedness to the Company when due shall constitute a breach of this Agreement by the Distributor.

8.     OBLIGATIONS UPON TERMINATION.  Upon termination of this Agreement, any and all rights and privileges the Distributor has under this Agreement shall terminate. Upon termination of this Agreement, Distributor will immediately discontinue all uses of the Company's trademarks and copyrighted materials. Nothing herein shall be construed or interpreted to imply or create any obligation on the part of the Company to repurchase any of Distributor's inventory upon termination or cancellation of this Agreement.

9.     INDEPENDENT CONTRACTOR.  The relationship between the Company and the Distributor is that of supplier and reseller. This Distributor is an independent contractor and is not a joint venturer with, or partner, agent or employee of the Company. Nothing in this Agreement shall be deemed to permit the Distributor to conduct business in the name of or on account of the Company, or to incur or assume any expense, debt, obligation, liability, tax responsibility in behalf of or in the name of the Company, or to act in the Company's behalf or to bind the Company in any way whatsoever.

10.     SALES BY THE COMPANY.  Nothing in this Agreement is intended to hinder or prevent the company from selling Products to companies based outside of Territory that have central purchasing divisions outside the Territory for locations or affiliates within the Territory.

11.     UNIT OF PAYMENT.  All payments to the Company or its subsidiaries or affiliates by the Distributor, unless otherwise agreed in writing, shall be made in United States dollars. "Dollars" or "$" on any price list or other relevant document means United States dollars.

12.   ASSIGNMENT.  The distributorship hereby created and the rights hereunder are not assignable and the obligations imposed on the Distributor pursuant hereto are not delegable without the prior written consent of the Company.  Any purported assignment or delegation without such prior written consent is void.  The Company may assign its rights and delegate its duties hereunder to any subsidiary or affiliate of the Company.

13.   NOTICES.  Notices required or permitted to be given pursuant to this Agreement shall be given in writing in the English language in person or by registered mail or certified mail addressed, in case of Company, to CORTEC Corporation, 4119 White Bear Parkway, St. Paul, MN 55110 and, in case of Distributor, to Distributor at the address set forth above or to such other address as either party shall have advised the other of in writing.

14.   ENTIRE AGREEMENT.  This Agreement contains the entire agreement between the Company and the Distributor and no representation, inducement, promise or agreement, oral or otherwise, including the terms of any prior distribution agreement between the parties not embodied herein shall be of any force or effect.

15.   CHOICE OF LAW AND JURISDICTION.  This Agreement shall be governed by the domestic law of the State of Minnesota, U.S.A., including the Uniform Commercial Code as enacted in that jurisdiction, other than the choice of law rules of such jurisdiction.  The Distributor hereby agrees that any legal suit, action or proceeding arising out of or relating to this Agreement may be instituted in the courts of the State of Minnesota or the United States District Court of the District of Minnesota and irrevocably and unconditionally submits to the jurisdiction of any such court for such purpose.    .

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their respective names by their respective officers thereunto duly authorized, all as of the date first above written.

**THE CORTEC CORPORATION**

(Corporate Seal)                                    By_____
                                                    B.A. Miksic
                                                    President/CEO


**INTERFACE DEVELOPPEMENT**
A/k/a _____


(Corporate Seal)                                    By_____
                                                    Name:
                                                    Title:

# EXHIBIT A

# PRODUCTS

The Products covered by this Agreement shall consist of the following products now produced by THE CORTEC CORPORATION:

Metalworking
Cleaning
Coatings
Packaging
Emitters
VCI Corrosion Inhibitor Powders
VCI Process Industries
VCI Water Treatment and Petroleum Additive Technology
Generic Chemicals

# EXHIBIT B

# PAYMENT TERMS

Payment for Products shipped to the Distributor from the United States of America in the form of irrevocable letter of credit, drawn on U.S. Bank acceptable to the Company shall be due and owing 30 days from the date of shipment, or draft payable at sight for shipments less that $5,000. The Company shall have the right to amend the terms of payment from time to time during the Term.

# EXHIBIT C

## SALES VOLUME SCHEDULE

The minimum purchases from the Company shall be:

Calendar 2000 year          $     30,000.00

Calendar 2001 year          $     50,000.00

## *INTERNATIONAL SAMPLE POLICY*

Cortec Corporation is pleased to provide literature and samples of products free of charge. This does not include the cost to ship the requested samples. All freight charges must be paid before shipping the literature and/or samples requested.

Wire transfer information is available upon request and we do not accept charge cards. Please provide legible and complete shipping address, phone and fax for all sample requests.

We have excellent rates with DHL, but we will provide quotes as needed.

**International Sample Department**


If you wish to send money via our bank, the information is listed below:

U.S. Bank National Association
International Banking Division
601 Second Avenue South
Minneapolis, Minnesota 55402

Int'l Wire Transfer                    **Please reference to bank:**
Account No. 1 801-21-09739-8                **SAMPLES/FREIGHT**
ABA No. 091-000-22
s.w.i.f.t. USBKUS44IMT

## DISTRIBUTION AGREEMENT



AGREEMENT dated as of August 25, 2006, between CORTEC CORPORATION, a Minnesota Corporation, with its executive offices at 4119 White Bear Parkway, St. Paul, Minnesota 55110, U.S.A. ("Company"), and Maverick, a company in Poland, located at Wieruszowska 12/16, 60-166 Poznan, Poland (the "Distributor").

## RECITALS

The Company manufactures and sells the Products listed on its current distributor price list, which is attached as Exhibit A to this Agreement (the "Products").

The Company desires to establish the Distributor as an authorized distributor of the Products in the Territory (as defined below) upon the terms and subject to the conditions set forth in this Agreement, and the Distributor desires to be so established.

## AGREEMENT

In consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1.     APPOINTMENT AND TERRITORY.   The company hereby appoints the Distributor, during the term of this Agreement and upon the terms and conditions herein set forth, an authorized distributor of the Products for Poland (the "Territory").  In connection with such appointment, the Company hereby grants to Distributor, subject to the terms and conditions of this Agreement, the following rights:

(a)     To purchase Products from the Company for resale in the Territory;

(b)     To purchase such promotional materials and sales aids as may be made available by the Company to Distributor and to use, or to make available to its dealers, such promotional materials and sales aids in connection with sale and resale of Products.

(c)     To identify Distributor as an independent authorized distributor of Products in or on stationery, forms, or other materials, office signs, vehicles, telephone directory listings and advertising matter used in the promotion, distribution, sale and resale of Products.  This right does not extend permission to Distributor to use the Company's trademarks, trade names and trading styles in Distributor's corporate or trade name.  Each use by Distributor of the Company's trademarks shall identify the Company as the owner of the trademarks.

2.    GENERAL DUTIES OF THE DISTRIBUTOR.

(a)    The Distributor shall use its best efforts to promote, create a demand for, distribute and sell the Products throughout the Territory.

(b)    Distributor agrees to maintain an adequate office and storage facility in the Territory for conduct of the business and for safe storage of Products.  The Distributor shall refrain, outside the Territory, from seeking customers for the Products, from establishing any branch and from maintaining any distribution depot for the Products.

(c)    The Distributor may repackage the Products only as follows:

(i)  The Distributor may repackage the Products in smaller containers than the containers in which Products are shipped to the Distributor by the Company.

(ii)    If the Company supplies Products to the Distributor in concentrate form, the Distributor may dilute or thin the concentrated Products locally in order to provide Products suitable for sale to local customer.  All such dilutions or thinning agents must be approved by the Company and in accordance with the Company's written specifications. At the Distributor's request, the Company will test solvents or thinning agents at the Company's expense, but the Company disclaims all liability or responsibility to the Distributor for diluting or thinning done by the Distributor or for any damages to or claims of third parties claimed to have been caused by Products that were diluted or thinned by Distributor or for any damages to or claims of third parties claimed to have been caused by Products that were diluted or thinned by Distributor, regardless of whether such testing has been performed by the Company.

(iii)    The Distributor shall not re-label or otherwise alter the packaging of any non-repackaged Products except that the Distributor may add a statement that the Products are products of THE CORTEC CORPORATION distributed in the Territory by the Distributor.  As to repackaged Products, labels shall be substantially the same as the labels provided by the Company on the Products except as to the descriptions of quantity or concentration and except that the Distributor may add a statement that the Products are products of THE CORTEC CORPORATION, distributed in the Territory by the Distributor.  Distributor agrees to make any changes in the labels of repackaged Products that are requested from time to time by the Company.

(d)    The Company's trademarks that may be used on the Products and the packaging are the exclusive property of the Company, and the use of those trademarks on the goods and packaging and the goodwill arising therefrom shall inure to the benefit of the Company. Distributor agrees not to take any action detrimental to the validity of the Company's trademarks or their ownership by the Company or to the goodwill of the Company related to such marks.  In

connection with the foregoing, Distributor agrees to use such trademarks only in connection with the Products and only in such form and manner as may be prescribed or permitted by the Company. Distributor also agrees to discontinue use of such trademarks, or to cause any of his dealers to discontinue use of such trademarks, upon receipt of written notice from the Company that, in the opinion of the Company, use of such trademarks by Distributor or by such dealer is injurious to the Company's rights, privileges and immunities as owner of such trademarks. Distributor will not claim any rights in any trademarks of the Company that the Company may use on the Products or their packaging or put in issue either the validity of those trademarks or the ownership by the Company of those trademarks. The Distributor shall not become or in any way be deemed to be the express or implied assignee of any trademark rights of the Company or any of its affiliates by reason of any of the rights granted to Distributor under this Agreement.

(e)     The Distributor agrees to conduct its operations in strict compliance with all applicable laws, ordinances, and regulations, to obtain all necessary permits and licenses, to pay all taxes, debts and other liabilities when due and in all respects to operate in a fair, ethical and lawful manner, and not to engage in any business practices which may reflect adversely upon the public image of the Company, its Products or its trademarks and the goodwill related thereto.

(f)     From time to time at the Company's request, the Distributor shall furnish, by airmail to the Company, a list of customers for the Products and the amount of purchases by each such customer for the period from the period covered by the Company's last request to the most recent month end, to the extent that such information is known to the Distributor.

3.     SALE OF PRODUCTS.   The Company shall sell to the Distributor, and the Distributor shall purchase from the Company, all Products which the Distributor requires for resale. The Company shall offer the Distributor the opportunity to distribute any newly developed products for temporary corrosion protection that are manufactured or sold by the Company from time to time, which products, if accepted for distribution by the Distributor, shall be listed on an amended distributor price list to be provided to Distributor by the Company and shall thereupon be deemed to be Products for the purposes of this Agreement.

4.     PRICES AND TERMS OF SALE.

(a)     The Products shall be sold to the Distributor at the prices shown on the Company's distributor price list in effect on the date the order is placed. Terms of sale shall be as provided in this Agreement, or if not provided in this Agreement, as shown on such distributor price list. The Distributor will be notified in writing a minimum of 30 days prior to the effective date of any change in prices or terms of sale. Payment terms shall be as shown on Exhibit B to this Agreement.

(b)     The Distributor's orders of Products, promotional materials and sales aids will be effective only when accepted by the Company by issuance of a written sales acknowledgment. The Company reserves the right at any time to change the design of Products and to change the

design of, add or withdraw promotional materials and sales aids. The Company shall not be liable for delay in furnishing any Product or other item because it is temporarily out of stock or has been discontinued or for any other reason.

(c)    All Products are sold F.O.B. the Company's facility. Title to the Products (and risk of loss) shall pass to the Distributor when the Products are delivered to the carrier at the Company's facility. The Distributor shall be responsible for importation of the Products into the Territory and for all freight charges, VAT, customs duties and the like in connection with the transport or import of the Products.

5.    NON-COMPETITION AND CONFIDENTIALITY.

(a)    The Distributor acknowledges that during the term (as hereinafter defined) the Company and its affiliates may disclose to the Distributor valuable confidential information and technology relating to the Products and will assist the Distributor in gaining market expertise in Products. The Distributor agrees that during the Terms and at all times thereafter, neither the Distributor nor any of its owners, officers or personnel shall disclose to any third party any information imparted to it by the Company or any of its affiliates which the Distributor knows or has reason to believe to be a trade secret or otherwise confidential. The Distributor acknowledges that the Company considers its specifications for diluting or thinning concentrated Products to be confidential information. The Distributor shall be fully responsible to the Company for any non-compliance with the provisions of this subsection (a) by any of the Distributor's owners, officers or personnel to the extent that compliance by such persons is enforceable under the laws of Poland.

(b)    Except as provided below, during the Term of this Agreement, the Distributor shall not, either directly or indirectly, manufacture or distribute any goods which compete with any of the Products unless the Distributor has obtained the Company's prior written consent, which the Company may grant or withhold at its discretion.

6.    TERM.

(a)    The term ("Term") of this Agreement shall commence on the date first above written and continue through August 25, 2008 (the "Initial Term"), and, unless terminated under this Section 6 or under Section 7 below, the Term shall be renewed thereafter for an additional one-year period ("Renewal Term") if (i) the Minimum Sales Volume for the Products agreed to between the Company and the Distributor with respect to the Initial Term has been fulfilled by the Distributor, and (ii) prior to the conclusion of the Initial Term, the Minimum Sales Volume for Products for the Renewal Term has been agreed to in writing by the Company and the Distributor. The Minimum Sales Volume for the Products for the Initial Term is annexed hereto as Exhibit C and incorporated herein by reference.

4                           08/25/06

(b)    If the Minimum Sales Volume for the Initial Term and the Minimum Sales Volume for the Renewal Term shall have been fulfilled by the Distributor, and if this Agreement shall not have been terminated under Section 7(a), then Distributor shall have the option to distribute the Products for three additional one-year periods provided (i) prior to the commencement of each such one-year period, the Minimum Sales Volume for Products for such period has been agreed to in writing by the Company and the Distributor and (ii) the Minimum Sales Volume for the Products for all periods prior to such additional one-year period has been fulfilled. The Distributor may exercise such option for each additional one-year period by providing written notice to the Company during the year preceding such additional one-year period.

7.    TERMINATION.  Either party may terminate this Agreement upon 30 days prior written notice if the other party commits a breach of any of the terms and conditions of this Agreement. Failure to pay any indebtedness to the Company when due shall constitute a breach of this Agreement by the Distributor.

8.    OBLIGATIONS UPON TERMINATION.  Upon termination of this Agreement, any and all rights and privileges the Distributor has under this Agreement shall terminate. Upon termination of this Agreement, Distributor will immediately discontinue all uses of the Company's trademarks and copyrighted materials. Nothing herein shall be construed or interpreted to imply or create any obligation on the part of the Company to repurchase any of Distributor's inventory upon termination or cancellation of this Agreement.

9.    INDEPENDENT CONTRACTOR.  The relationship between the Company and the Distributor is that of supplier and reseller. This Distributor is an independent contractor and is not a joint venturer with, or partner, agent or employee of the Company. Nothing in this Agreement shall be deemed to permit the Distributor to conduct business in the name of or on account of the Company, or to incur or assume any expense, debt, obligation, liability, tax responsibility in behalf of or in the name of the Company, or to act in the Company's behalf or to bind the Company in any way whatsoever.

10.    SALES BY THE COMPANY.  Nothing in this Agreement is intended to hinder or prevent the company from selling Products to companies based outside of Territory that have central purchasing divisions outside the Territory for locations or affiliates within the Territory.

11.    UNIT OF PAYMENT.  All payments to the Company or its subsidiaries or affiliates by the Distributor, unless otherwise agreed in writing, shall be made in United States dollars. "Dollars" or "$" on any price list or other relevant document means United States dollars.

12.    ASSIGNMENT.  The distributorship hereby created and the rights hereunder are not assignable and the obligations imposed on the Distributor pursuant hereto are not delegable without the prior written consent of the Company.  Any purported assignment or delegation without such prior written consent is void. The Company may assign its rights and delegate its duties hereunder to any subsidiary or affiliate of the Company.

13.    NOTICES.  Notices required or permitted to be given pursuant to this Agreement shall be given in writing in the English language in person or by registered mail or certified mail addressed, in case of Company, to CORTEC Corporation, 4119 White Bear Parkway, St. Paul, MN 55110 and, in case of Distributor, to Distributor at the address set forth above or to such other address as either party shall have advised the other of in writing.

14.    ENTIRE AGREEMENT.  This Agreement contains the entire agreement between the Company and the Distributor and no representation, inducement, promise or agreement, oral or otherwise, including the terms of any prior distribution agreement between the parties not embodied herein shall be of any force or effect.

15.    CHOICE OF LAW AND JURISDICTION.  Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat, or legal place of arbitration shall be Minneapolis, Minnesota, USA. The language to be used in the arbitral proceeding shall be English. The governing law of contract shall be the substantive law of the State of Minnesota, USA.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their respective names by their respective officers thereunto duly authorized, all as of the date first above written.

THE CORTEC CORPORATION

(Corporate Seal)                    By

B.A. Miksic
President/CEO


MAVERICK

(Corporate Seal)                    By
                                    Name:
                                    Title:

6                          08/25/06

# EXHIBIT A

## PRODUCTS

The Products covered by this Agreement shall consist of the following products now produced by THE CORTEC CORPORATION:

Process Industry Products
Water Treatment
Powders
Additives
Coatings
Metalworking
Surface Preparation

# EXHIBIT B

# PAYMENT TERMS

Payment for Products shipped to the Distributor from the United States of America in the form of irrevocable letter of credit, drawn on U.S. Bank acceptable to the Company shall be due and owing 30 days from the date of shipment, or draft payable at sight for shipments less that $5,000.  The Company shall have the right to amend the terms of payment from time to time during the Term.

# EXHIBIT C

## SALES VOLUME SCHEDULE

The minimum purchases from the Company shall be:

| | | |
|---|---|---|
| Calendar 2006/2007 year | $ | 20,000 |
| Calendar 2007/2008 year | $ | 35,000 |
| Initial order | $ | 7,000 |

08/25/06

## *INTERNATIONAL SAMPLE POLICY*

Cortec Corporation is pleased to provide literature and samples of products free of charge. This does not include the cost to ship the requested samples. All freight charges must be paid before shipping the literature and/or samples requested.

Wire transfer information is available upon request and we do accept charge cards, Visa and Mastercard. Please provide legible and complete shipping address, phone and fax for all sample requests.

We have excellent rates with UPS, but we will provide quotes as needed.

**International Sample Department**

If you wish to send money via our bank, the information is listed below:

U.S. Bank National Association
International Banking Division
601 Second Avenue South
Minneapolis, Minnesota  55402

Int'l Wire Transfer                    **Please reference to bank:**
Account No. 1 801-21-09739-8          **SAMPLES/FREIGHT**
ABA No. 091-000-22
s.w.i.f.t. USBKUS44IMT

**COPY**

## DISTRIBUTION AGREEMENT

AGREEMENT dated as of July 28, 1995 between CORTEC Corporation, a Minnesota Corporation, with its executive offices at 4119 White Bear Parkway, St. Paul, Minnesota, 55110, U.S.A. ("Company"), and Carte Dozio S.r.l. a company in Italy, located at Via G. Galilei, 15, 20091 Bresso, Milan, Italy (the "Distributor").

### RECITALS

The Company manufactures and sells the Packaging products listed on its current distributor price list, which is attached as Exhibit A to this Agreement (the "Products").

The Company desires to establish the Distributor as an authorized distributor of the Products in the Territory (as defined below) upon the terms and subject to the conditions set forth in this Agreement, and the Distributor desires to be so established.

### AGREEMENT

In consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1.   <u>APPOINTMENT AND TERRITORY</u>.   The Company hereby appoints the Distributor, during the term of this Agreement and upon the terms and conditions herein set forth, an authorized distributor of the packaging Products for Italy (the "Territory").   In connection with such appointment, the Company hereby grants to Distributor, subject to the terms and conditions of this Agreement, the following rights:

(a)   To purchase Products from the Company for resale in the Territory;

(b)   To purchase such promotional material and sales aids as may be made available by the Company to Distributor and to use, or to make available to its dealers, such promotional materials and sales aids in connection with sale and resale of Products.

(c)   To identify Distributor as an independent authorized distributor of Products in or on stationery, forms or other materials, office signs, vehicles, telephone directory listings and advertising matter used in the promotion, distribution, sale and resale of Products.   This right does not extend permission to Distributor to use the Company's trademarks, trade names and trading styles in Distributor's corporate or

page 2

trade name.    Each use by Distributor of the Company's trademarks shall identify the Company as the owner of the trademarks.

2.  <u>GENERAL DUTIES OF THE DISTRIBUTOR</u>

(a)    The Distributor shall use its best efforts to promote, create a demand for, distribute and sell the Products throughout the Territory.

(b)    Distributor agrees to maintain an adequate office and storage facility in the Territory for conduct of the business and for safe storage of Products.    The Distributor shall refrain, outside the Territory, from seeking customers for the Products, from establishing any branch and from maintaining any distribution depot for the Products.

(c)    The Distributor may repackage the Products only as follows:

(i)    The Distributor may repackage the Products in smaller containers than the containers in which Products are shipped to the Distributor by the Company.

(ii)    If the Company supplies Products to the Distributor in concentrate form, the Distributor may dilute or thin the concentrated Products locally in order to provide Products suitable for sale to local customer.    All such dilution or thinning agents approved by the Company and in accordance with the Company's written specifications.    At the Distributor's request, the Company will test solvents or thinning agents at the Company's expense, but the Company disclaims all liability or responsibility to the Distributor for diluting or thinning done by the Distributor or for any damages to or claims of third parties claimed to have been caused by Products that were diluted or thinned by Distributor, regardless of whether such testing has been performed by the Company.

(iii)    The Distributor shall not re-label or otherwise alter the packaging of any non-repackaged Products except that the Distributor may add a statement that the Products are products of the CORTEC Corporation distributed in the Territory by the Distributor.    As to repackaged Products, labels shall be substantially the same as the labels provided by the Company on the Products except as to the descriptions of quantity or concentration and except that the Distributor may add

page 3

a statement that the Products are products of the CORTEC Corporation, distributed in the Territory by the Distributor. Distributor agrees to make any changes in the labels of repackaged Products that are requested from time to time by the Company.

(d)  The Company's trademarks that may be used on the Products and the packaging are the exclusive property of the Company, and the use of those trademarks on the goods and packaging and the goodwill arising therefrom shall inure to the benefit of the Company. Distributor agrees not to take any action detrimental to the validity of the Company's trademarks or their ownership by the Company or to the goodwill of the Company related to such marks. In connection with the foregoing, Distributor agrees to use such trademarks only in connection with the Products and only in such form and manner as may be prescribed or permitted by the Company. Distributor also agrees to discontinue use of such trademarks, or to cause any of his dealers to discontinue use of such trademarks, upon receipt of written notice from the Company that, in the opinion of the Company, use of such trademarks by Distributor or by such dealer is injurious to the Company's right, privileges and immunities as owner of such trademarks. Distributor will not claim any rights in any trademarks of the Company that the Company may use on the Products or their packaging or put in issue either the validity of those trademarks or the ownership by the Company of those trademarks. The Distributor shall not become or in any way be deemed to be the express or implied assignee of any trademark rights of the Company or any of its affiliates by reason of any of the rights granted to Distributor under this Agreement.

(e)  The Distributor agrees to conduct its operations in strict compliance with all applicable laws, ordinances, and regulations, to obtain all necessary permits and licenses, to pay all taxes, debts and other liabilities when due and in all respects to operate in a fair, ethical and lawful manner, and not to engage in any business practices which may reflect adversely upon the public image of the Company, its Products or its trademarks and the goodwill related thereto.

(f)  From time to time at the Company's request, the Distributor shall furnish, by airmail to the Company, a list of customers for the Products and that amount of purchases by each such customer for the period from the period covered by the Company's last request to the most recent month end, to the extent that such information is known to the Distributor.

3.  <u>SALE OF PRODUCTS</u>.  The Company shall sell to the Distributor, and the Distributor shall purchase from the

page 4

Company, all Products which the Distributor requires for resale. The Company shall offer the Distributor the opportunity to distribute any newly developed products for corrosion protection that are manufactured or sold by the Company from time to time, which products, if accepted for distribution by the Distributor, shall be listed on an amended distributor price list to be provided to Distributor by the Company and shall thereupon be deemed to be Products for the purposes of this Agreement.

4. <u>PRICES AND TERMS OF SALE</u>.

(a) The Products shall be sold to the Distributor at the prices shown on the Company's distributor price list in effect on the date the order is placed. Terms of sale shall be as provided in this Agreement, or if not provided in this Agreement, as shown on such distributor price list. The Distributor will be notified in writing a minimum of 30 days prior to the effective date of any change in prices or terms of sale. Payment terms shall be as shown on Exhibit B to this Agreement.

(b) The Distributor's orders of Products, promotional materials and sales aids will be effective only when accepted by the Company by issuance of a written sales acknowledgement. The Company reserves the right at any time to change the design of Products and to change the design of, add or withdraw promotional material and sales aids. The Company shall not be liable for delay in furnishing any Product or other item because it is temporarily out of stock or has been discontinued or for any other reason.

(c) All Products are sold F.O.B. the Company's facility. Title to the Products (and risk of loss) shall pass to the Distributor when the Products are delivered to the carrier at the Company's facility. The Distributor shall be responsible for importation of the Products into the Territory and for all freight charges, VAT, customs duties and the like in connection with the transport or import of the Products.

5. <u>NON-COMPETITION AND CONFIDENTIALITY</u>.

(a) The Distributor acknowledges that during the term (as hereinafter defined) the Company and its affiliates may disclose to the Distributor valuable confidential information and technology relating to the Products and will assist the Distributor in gaining market expertise in Products. The Distributor agrees that during the Term and at all times thereafter, neither the Distributor nor any of its owners, officers or personnel shall disclose to any third party any

page 5

information imparted to it by the Company or any of its affiliates which the Distributor knows or has reason to believe to be a trade secret or otherwise confidential. The Distributor acknowledges that the Company considers its specifications for diluting or thinning concentrated Products to be confidential information. The Distributor shall be fully responsible to the Company for any non-compliance with the provisions of this subsection (a) by any of the Distributor's owners, officers or personnel to the extent that compliance by such persons is enforceable by the Distributor under the laws of Italy.

(b) Except as provided below, during the Term of this Agreement, the Distributor shall not, either directly or indirectly, manufacture or distribute any goods which compete with any of the Products unless the Distributor has obtained the Company's prior written consent, which the Company may grant or withhold at its discretion.

6. <u>TERMS</u>.

(a) The term ("Term") of this Agreement shall commence on the date first above written and continue through December 31, 1997 (the "Initial Term"), and, unless terminated under this Section 6 or under Section 7 below, the Term shall be renewed thereafter for an additional one-year period ("Renewal Term") if (i) the Minimum Sales Volume for the Products agreed to between the Company and the Distributor with respect to the Initial Term has been fulfilled by the Distributor, and (ii) prior to the conclusion of the Initial Term, the Minimum Sales Volume for Products for the Renewal Term has been agreed to in writing by the Company and the Distributor. The Minimum Sales Volume for the Products for the Initial Term is annexed hereto as Exhibit C and incorporated herein by reference.

(b) If the Minimum Sales Volume for the Initial Term and the Minimum Sales Volume for the Renewal Term shall have been fulfilled by the Distributor, and if this Agreement shall not have been terminated under Section 7(a), then Distributor shall have the option to distribute the Products for three additional one-year periods provided (i) prior to the commencement of each such one-year period, the Minimum Sales Volume for Products for such period has been agreed to in writing by the Company and the Distributor and (ii) the Minimum Sales Volume for the Products for all periods prior to such additional one-year period has been fulfilled. The Distributor may exercise such option for each additional one-year period by providing written notice to the Company during the year preceding such additional one-year period.

page 6

7.    <u>TERMINATION</u>.    Either party may terminate this Agreement upon 30 days prior written notice if the other party commits a breach of any of the terms and conditions of this Agreement.    Failure to pay any indebtedness to the Company when due shall constitute a breach of this Agreement by the Distributor.

8.    <u>OBLIGATIONS UPON TERMINATION</u>.    Upon termination of this Agreement, any and all rights and privileges the Distributor has under this Agreement shall terminate.    Upon termination of this Agreement, Distributor will immediately discontinue all uses of the Company's trademarks and copyrighted materials.    Nothing herein shall be construed or interpreted to imply or create any obligation on the part of the Company to repurchase any of Distributor's inventory upon termination or cancellation of this Agreement.

9.    <u>INDEPENDENT CONTRACTOR</u>.    The relationship between the Company and the Distributor is that of supplier and reseller.    This Distributor is an independent contractor and is not a joint venturer with, or partner, agent or employee of the Company.    Nothing in this Agreement shall be deemed to permit the Distributor to conduct business in the name of or on account of the Company, or to incur or assume any expense, debt, obligation, liability, tax responsibility in behalf of or in the name of the Company, or to act in the Company's behalf or to bind the Company in any way whatsoever.

10.    <u>SALES BY THE COMPANY</u>.    Nothing in this Agreement is intended to hinder or prevent the company from selling Products to companies based outside of Territory that have central purchasing divisions outside the Territory for locations of affiliates within the Territory.

11.    <u>UNIT OF PAYMENT</u>.    All payments to the Company or its subsidiaries or affiliates by the Distributor, unless otherwise agreed in writing, shall be made in United Sates dollars.    "Dollars" or "$" on any price list or other relevant document means United States dollars.

12.    <u>ASSIGNMENT</u>.    The distributorship hereby created and the rights hereunder are not assignable and the obligations imposed on the Distributor pursuant hereto are not delegable without the prior written consent of the Company.    Any purported assignment or delegation without such prior written consent is void.    The Company may assign its rights and delegate its duties hereunder to any subsidiary or affiliate of the Company.

page 7

13.  <u>NOTICES</u>.  Notices required or permitted to be given pursuant to this Agreement shall be given in writing in the English language in person or by registered mail or certified mail addressed, in case of Distributor, to CORTEC Corporation, 4119 White Bear Parkway, St. Paul, MN 55110 and, in case of Company, to Distributor at the address set forth above or to such other address as either party shall have advised the other of in writing.

14.  <u>ENTIRE AGREEMENT</u>.  This Agreement contains the entire agreement between the Company and the Distributor and no representation, inducement, promise or agreement, oral or otherwise, including the terms of any prior distribution agreement between the parties not embodied herein shall be of any force or effect.

15.  <u>CHOICE OF LAW AND JURISDICTION</u>.  All disputes among the parties that relate to this Agreement, its validity, fulfillment, cancellation or any other disputes which may arise among the parties with regard to the Agreement, will be settled by the Court of Arbitration of the Chamber of Commerce in Zurich, pursuant to the procedural regulations of the said arbitration.  In the event that the parties seek arbitration under the article, it is agreed between the Company and the Distributor, that the Arbitration is binding in any country in which the breach occurred.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their respective names by their respective officers thereunto duly authorized, all as of the date first above written.

THE CORTEC CORPORATION

By _____
   B.A. Miksic
   President

CARTE DOZIO S.r.l.

(Corporate Seal)

By _____
   Title:

(Corporate Seal)