# EXHIBIT I

 COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 08.11.2006
SEC (2006) 1385

**COMMISSION STAFF WORKING DOCUMENT**

**Croatia 2006 Progress Report**

EN

{COM (2006) 649 final}

**EN**                                                                                           **EN**

# TABLE OF CONTENTS

1.      Introduction ........................................................................................................ 4

1.1.    Preface .............................................................................................................. 4

1.2.    Relations between the EU and Croatia .............................................................. 4

2.      Political criteria ................................................................................................ 5

2.1.    Democracy and the rule of law ......................................................................... 5

2.2.    Human rights and the protection of minorities ................................................. 8

2.3.    Regional issues and international obligations .................................................. 13

3.      Economic criteria ............................................................................................ 18

3.1.    Introduction .................................................................................................... 18

3.2.    Assessment in terms of the Copenhagen criteria ............................................ 18

3.2.1.  The existence of a functioning market economy ............................................ 18

3.2.2.  The capacity to cope with competitive pressure and market forces within the Union ......................................................................................................................... 22

4.      Ability to assume the obligations of membership ........................................... 24

4.1.    Chapter 1: Free movement of goods ............................................................... 25

4.2.    Chapter 2: Freedom of movement for workers ............................................... 27

4.3.    Chapter 3: Right of establishment and freedom to provide services .............. 27

4.4.    Chapter 4: Free movement of capital .............................................................. 28

4.5.    Chapter 5: Public procurement ....................................................................... 29

4.6.    Chapter 6: Company law ................................................................................. 30

4.7.    Chapter 7: Intellectual property law ............................................................... 31

4.8.    Chapter 8: Competition Policy ........................................................................ 32

4.9.    Chapter 9: Financial Services .......................................................................... 33

4.10.   Chapter 10: Information society and media ..................................................... 34

4.11.   Chapter 11: Agriculture ................................................................................... 35

4.12.   Chapter 12: Food safety, veterinary and phytosanitary policy ....................... 36

4.13.   Chapter 13: Fisheries ...................................................................................... 38

4.14.   Chapter 14: Transport policy .......................................................................... 39

4.15.   Chapter 15: Energy ......................................................................................... 40

**EN**                         2                         **EN**

4.16.    Chapter 16: Taxation ........................................................................................... 41

4.17.    Chapter 17: Economic and Monetary Union ...................................................... 42

4.18.    Chapter 18: Statistics .......................................................................................... 43

4.19.    Chapter 19: Employment and Social Policy ...................................................... 44

4.20.    Chapter 20: Enterprise and Industrial Policy .................................................... 45

4.21.    Chapter 21: Trans European Networks ............................................................... 46

4.22.    Chapter 22: Regional Policy and Coordination of Structural Instruments ................ 47

4.23.    Chapter 23: Judiciary and fundamental rights .................................................. 48

4.24.    Chapter 24: Justice, Freedom and Security ....................................................... 53

4.25.    Chapter 25: Science & Research ........................................................................ 56

4.26.    Chapter 26: Education & Culture ....................................................................... 57

4.27.    Chapter 27: Environment .................................................................................... 58

4.28.    Chapter 28: Consumer and Health Protection .................................................... 60

4.29.    Chapter 29: Customs Union ............................................................................... 61

4.30.    Chapter 30: External Relations .......................................................................... 61

4.31.    Chapter 31: Foreign, Security and Defence Policy ............................................ 62

4.32.    Chapter 32: Financial control ............................................................................ 63

4.33.    Chapter 33: Financial and Budgetary Provisions .............................................. 64

STATISTICAL ANNEX ................................................................................................... 66

**EN**

**EN**

COMMISSION STAFF WORKING DOCUMENT

Croatia 2006 Progress Report

1. **INTRODUCTION**

1.1. **Preface**

Since March 2002, the Commission has reported regularly to the Council and the Parliament on progress made by the countries of the Western Balkans region.

This report on progress made by Croatia in preparing for EU membership largely follows the same structure as in previous years. The report:

– briefly describes the relations between Croatia and the Union;

– analyses the situation in Croatia in terms of the political criteria for membership;

– analyses the situation in Croatia on the basis of the economic criteria for membership;

– reviews Croatia's capacity to assume the obligations of membership, that is, the *acquis* expressed in the Treaties, the secondary legislation, and the policies of the Union.

The period covered by this report is 1 October 2005 to 30 September 2006. Progress is measured on the basis of decisions taken, legislation adopted and measures implemented. As a rule, legislation or measures which are under preparation or await Parliamentary approval have not been taken into account. This approach ensures equal treatment across all reports and permits an objective assessment.

The report is based on information gathered and analysed by the Commission. In addition, many sources have been used, including contributions from the government of Croatia, the Member States, European Parliament reports[1], and information from various international and non-governmental organisations.

The Commission draws conclusions regarding Croatia in its separate communication on enlargement[2], based on the technical analysis contained in this report.

1.2. **Relations between the EU and Croatia**

**Accession negotiations** were opened with Croatia in October 2005. The first phase of the accession process, the analytical examination of the *acquis* (screening), was completed in October 2006. Negotiations on one chapter, science and research, were opened and provisionally closed in June.

---

[1] The *rapporteur* for Croatia is Mr Hannes Swoboda.
[2] Enlargement Strategy and Main Challenges 2006 – 2007.

In order to support the reform process, the Commission has continued its regular monitoring of the Copenhagen political criteria, with frequent meetings in Zagreb and Brussels.

Implementation of the **Stabilisation and Association Agreement (SAA)** has largely continued without major difficulty. Notable exceptions include delayed compliance with the state aid provisions and in particular the need to present restructuring plans in the shipbuilding and steel sectors. There are also difficulties with the provisions on access to real estate, where existing rules are not being applied in a full and expedient manner as required by the SAA.

The revised **Accession Partnership** was adopted in February 2006, which sets out priorities that Croatia should address in its preparations for accession in the short- and medium-term,

The EC pre-accession **financial assistance** amounts to € 140 million for 2006. The Commission decided to confer the management of aid on a decentralised basis to Croatia's Central Financing and Contracting Unit (CFCU) in February 2006, while maintaining the ex-ante approval requirements.

## 2.    POLITICAL CRITERIA

This section examines progress made by Croatia towards meeting the Copenhagen political criteria which require stability of institutions guaranteeing democracy, the rule of law, human rights and respect for and protection of minorities. It also monitors, regional cooperation, good neighbourly relations, and the respect for international obligations, such as cooperation with the UN International Criminal Tribunal for the former Yugoslavia.

### 2.1.    Democracy and the rule of law

*Parliament*

The Parliament has dealt with an increasing amount of EU-related legislation but significant challenges lie ahead in the context of *acquis* alignment. The Parliamentary Committee on Minorities has shown commendable maturity over the past year in terms of raising awareness of minority issues and promoting reconciliation. The Committee for the Establishment of Conflict of Interest adopted its operating procedures. In February 2006, Parliament adopted the conclusions of its Investigative Commissions into two Members of Parliament, concluding in one case that the person concerned was in conflict of interest during his ministerial mandate.

However, there has been no follow up to these conclusions. Investigative Commissions appear to be used partly as a political tool rather than a serious means to tackle conflicts of interest. The conduct of the debate in Parliament on the public broadcaster amid attempts at political interference in December 2005 was also less than laudable.

In relation to electoral legislation, Parliament adopted in March 2006, a law foreseeing the establishment of a permanent and independent State Election Commission (SEC) to be responsible for Parliamentary, Presidential and local elections. Other aspects of electoral reforms mentioned in previous reports remain to be definitively addressed, notably the regulation of the financing of political parties and electoral campaigns, out-of-country voting as well as the updating of the voters' lists.

*Government*

There have been some limited changes in the functioning of government. In March 2006 the then Justice Minister and leader of the Democratic Centre Party was replaced by HDZ's Ana Lovrin, leading to the withdrawal of DCP from the HDZ-led governing coalition. The government's majority in the Sabor was thus reduced to one seat.

*Public administration*

In January 2006, the Central State Office for Administration (CSOA) began work on a public administration reform strategy. However, no proposal has as yet been submitted to the Government for approval, meaning there is still no overall strategic framework for tackling this crucial issue.

A new independent Civil Service Council tasked with dealing with complaints against administrative decisions was set up in April 2006. In September 2006 the Government adopted a policy paper committing itself to drafting a revised General Administrative Procedures Act (GAPA) by July 2007.

However, besides the existing GAPA, there are numerous special administrative procedures regulated through special legislation. The existing legal administrative system in Croatia is cumbersome and needs simplification. The wide discretionary scope in legislation leads to inefficiency and legal uncertainty and facilitates corruption. The Administrative Court is unable to cope with the present workload of reviewing administrative decisions.

The new Civil Service Law reported on last year entered into force in January 2006. This law is an important first step in the reform process. It addresses – to a degree – the need to reduce the number of political appointees in the public administration.

In March 2006, a new law on direct election of municipal and city mayors as well as of county prefects was adopted.

As regards the police, reforms continue under the Croatian Police Action Plan 2004-07 according to which the police should be transformed from a "force" to a "service". There has been progress in implementing the Community Policing Action Strategy, leading to important improvements in relations between the police and citizens. There has been some progress in the recruitment of minorities to the police. Authorities usually act quickly when serious shortcomings in police conduct occur.

In June 2006 the Parliament adopted a law on Croatia's security and intelligence system. All political actors agree on the need for reform of the intelligence services. The current Intelligence Agency and Counter-intelligence Agency is being replaced by the Security and Intelligence Agency, in charge of civilian intelligence. The existing Military Security and Intelligence Agency will remain. The work of security and intelligence agencies will be monitored by Parliament, the Office of the Council for National Security and the Council for the Civilian Supervision of Security and Intelligence Services.

In March 2006, the Government also adopted a Draft Law on Data Secrecy and a Draft Law on Information Security. The Law on Data Secrecy as well as the reform of the security services were included in the Action Plan drawn up in the context of the Gotovina case in 2005. This plan was a response to the constant leaking of classified information as well as accompanying scandals involving the secret services and alleged inappropriate use of wiretapping and surveillance.

**EN**                                                6                                                **EN**

However, a number of issues require attention. The Civil Service Law left many critical issues to implementing legislation, the adoption and full and proper implementation of which is required if the law is to have any positive effect. So far only seven out of thirteen foreseen implementing regulations have been adopted. The de-politisation clauses will only take effect upon formal assumption of office of the government established after the first parliamentary elections following the entry into force of the new Law. This means that civil service in Croatia continues to be somewhat dependent on political affinities. Policy making effectively lies in the hands of political advisors. Even for new vacancies, provision has not been made for immediate de-politisation. More generally, the civil service in Croatia also suffers from high staff turnover and a lack of qualified personnel.

The administrative and management capacity of institutions in charge of public administration reform, particularly the Central State Office for Administration, is not yet sufficient. As regards training of civil servants, the Civil Service Training Centre is not yet operational.

There has been limited progress in the decentralisation process, which is important for the development of capacities and the clear definition of the responsibilities of local self-government. The Decentralisation Commission was set up in December 2004 but has not yet established itself as the main body leading the decentralisation process. There are still no clear strategic guidelines for the future direction of this process. There has been criticism of a lack of clarity on relations between directly elected officials and local assemblies. Two incidents in December 2005 at the Pozega-Slavonia-County Assembly and in Sisak respectively were illustrative of a general need to improve ethical standards in local politics. While repeat elections were held in certain localities following allegations of mandate "selling" connected with the local elections of spring 2005, follow-up has been limited. There has also been no definitive regulation of the issue of blank resignations. There is no planned and concerted effort from the relevant institutions to introduce clear and transparent rules and procedures with regard to elections and the forming of governments at the local level.

Further implications of possible links between organised crime and the police are not always followed-up. Overall, progress on police reform is slow and without clear direction. Weaknesses in recruitment and human resources management and development remain. The role of politics cannot be completely excluded, even in the recruitment of technical staff.

It needs to be ensured that the civil institutions overseeing the work of the intelligence agencies can adequately carry out their functions. In case of shortcomings, appropriate follow-up action has to be taken.

The draft Law on Data Secrecy has not yet been sent to Parliament, however, following heavy criticism by NGOs and the press for providing too wide and vague a definition of data secrecy and national security interest amid concerns that secrecy could become the rule rather than the exception. A balance between the interest of the public to be informed and the protection of national security needs to be carefully struck.

Overall, the issue of public administration reform continues to represent a major challenge for Croatia. It will require sustained serious attention from the authorities if Croatia is to eventually enjoy the professional, efficient, accountable, transparent and independent public administration it needs at central and local level. Such efforts are also needed to provide an important basis for the successful implementation of the *acquis*.

*Judicial system*

**EN**

**EN**

Implementation of the judicial reform strategy has begun. Legislative and organisational changes have been made aimed at improving the functioning of the judiciary. Some progress has been made in reducing the case backlog.

However, reform is at an early stage and the judicial system continues to suffer from severe shortcomings. Successful implementation of the reform strategy requires serious sustained efforts. More needs to be done to reduce the still significant case backlog, to reduce the length of court proceedings, improve case management, rationalise the court network, including the closure of courts, to ensure proper enforcement of judgements and to reform legal aid. To ensure impartiality the procedures for the appointment, training and disciplining of judicial officials need to improve. Croatia is still some way from enjoying an independent, impartial, transparent and efficient judicial system, the establishment of which will be an important indicator of Croatia's readiness for eventual membership and a prerequisite for the successful implementation of the *acquis* (*see Chapter 23: Judiciary and fundamental rights*).

*Anti-corruption policy*

A new anti-corruption programme was adopted in March 2006. A number of sectoral actions plans were subsequently prepared and the Minister of Justice appointed as coordinator. The importance of tackling corruption is being increasingly highlighted by senior politicians. Measures have recently been taken in some hitherto uninvestigated corruption cases. The Office for the Prevention of Corruption and Organised Crime (USKOK) has been strengthened.

However, corruption remains a serious problem. Many allegations of corruption remain uninvestigated and corrupt practices usually go unpunished. Implementation of the anti-corruption programme is at an early stage. Full implementation of the programme and strong political will to step up efforts are needed, especially on high level corruption. There continues to be a need for greater efforts to proactively prevent, detect and effectively prosecute corruption. Awareness of corruption as a serious criminal offence needs to be raised and codes of conduct and action plans to prevent corruption developed in the relevant law enforcement agencies. USKOK and other bodies involved in the anti-corruption programme need further strengthening and coordination among them needs to be improved. The fight against organised crime needs further attention. Progress on tackling corruption will also be an important indicator of Croatia's readiness for eventual membership (*see Chapter 23: Judiciary and fundamental rights*).

## 2.2.     Human rights and the protection of minorities

*Observance of international human rights law*

The European Court of Human Rights (ECtHR) delivered 25 judgements concerning Croatia in the reporting period. The majority of judgments issued against Croatia continue to concern violations of the right to a fair trial and the length of proceedings, under Article 6 of the European Convention for the Protection of Human Rights (ECHR).

In March 2006, the Court issued its judgement in the case *Blecic v. Croatia* regarding Occupancy/Tenancy Rights (OTR). The Court decided that it had no jurisdiction over the case as the *ratione temporis* requirement was not fulfilled. There is, therefore, as yet no international legal opinion on the question of OTR and their termination by the Croatian

EN

EN

courts. However, while most of the judicial terminations occurred in the early nineties, there are still a number of pending cases at Croatian courts that might end up before the ECtHR.

*Civil and political rights*

In March 2006, the European Court of Human Rights ruled in the Cenbauer v. Croatia case that there had been a violation of Article 3, condemning Croatia for **degrading treatment** of a former prisoner of the Lepoglava State Prison. While Croatia has already addressed this case, further improvements in prison conditions are needed more generally (*see Chapter 23*).

As regards the **right to an effective remedy and to a fair trial**, there has been some progress. There has been progress in tackling ethnic bias in war crimes trials. However, difficulties as regards witness protection in the broadest sense remain (*see below*). An integrated legal aid system for both criminal and civil proceedings still needs to be put in place.

There are generally no difficulties reported as regards **arbitrary arrest**, which is forbidden by the Constitution.

There have been no particular difficulties reported as regards violation of the **freedom of religion**.

With respect to the **freedom of expression**, the media remains free, deregulated to a large extent and generally subject to free market rules. In June 2006 Parliament approved amendments to the Criminal Code abolishing the sanction of prison sentences for libel.

However, concerns expressed in the 2005 Progress Report concerning possibilities for political influence at the local level remain valid. Two cases in particular concerning the political TV shows "Otvoreno" and "Latinica" also highlighted political pressure being exerted on the public broadcaster HRT, threatening its independence and raising concerns about freedom of expression in Croatia. The procedure for the appointment of the steering committee of the state news service HINA suffered important shortcomings.

No progress has been made in following up the recommendations of the 2004 joint expert mission for changes to the Law on Electronic Media and to the Law on Croatian Radio and Television, which remains a short term partnership priority. The improved media legislation should reflect European standards and facilitates media freedom and independence, in particular through improved legal and regulatory framework including the creation of safeguards against political interference.

There have been no particular difficulties as regards **freedom of assembly/association**.

**Civil society organisations** continue to play an important role in the promotion and protection of human rights and democracy in Croatia. However, NGOs are still often viewed with suspicion from within the establishment.

*Economic and Social Rights*

In the field of **women's rights**, the National Policy for the Promotion of Gender Equality came into effect in 2006, covering the period up to 2010. This document includes a large number of measures for improvement of the general social position of women and for raising awareness of the need to respect women's rights. In the field of equal opportunities in the

**EN**

**EN**

labour market, objectives include reduction of unemployment and elimination of discrimination, promotion of women's entrepreneurship and better enforcement of labour law, including encouragement to women to make use of existing mechanisms for filing discrimination claims. The document also strengthens and promotes measures that enable reconciliation of family and professional obligations.

The Office for Gender Equality has also initiated the creation and networking of county gender-equality committees. In November 2005, trained around-the-clock teams were established in police departments to deal with family violence. Enforcement of existing provisions on gender equality remains problematic, however, and is hampered by the absence of gender-segregated statistical indicators. Concern has been voiced over a growing number of cases of discrimination against women. Overall, the work of the Ombudsman for Gender Equality lacks visibility. Further efforts are needed to tackle human trafficking.

In the area of **children's rights**, a National Plan for the Benefit of the Rights and Interests of the Child 2006-2012 was adopted in March 2006. In the same month, the Parliament finally nominated a new Ombudsman for Children. There has been little follow-up to the Parliament's Committee for Human Rights finding in October 2005 that there was a lack of proper supervision of children's homes and inadequate coordination among the bodies involved. There has been limited follow up of cases of ill-treatment of children in such institutions, beyond the dismissal of the Deputy State Prosecutor (in the Brezovica case).

As for **socially vulnerable or disabled persons**, a pilot project to introduce a system of personal assistants to support disabled persons and their families is on-going and a few further advanced models of community services are also being piloted. However, budgetary constraints continue to limit the scope of their rights to health and special care and their social integration. More attention is needed for the implementation of the National Plan for the Disabled. Despite government policy in favour of deinstitutionalisation, the number of mentally disabled persons in institutions has increased by over 19% in the past year.

As regards **trade union's rights**, the situation in Croatia was more favourable than in previous years, with the authorities having taken steps to solve property-related problems of trade unions, for example. However, there are concerns about inefficient courts and certain restrictions on the right to strike. Weak administrative capacity of the relevant State authorities responsible for overseeing implementation of labour law further restricts workers' rights.

The process of **restitution of property** that was confiscated during the Yugoslav regime continues to proceed slowly. Provisions discriminating on grounds of nationality have not been removed from the Law on the Restitution of Nationalised Property.

*Minority rights, cultural rights and the protection of minorities*

Implementation of the Constitutional Law on National Minorities (CLNM) continues to be slow and problems persist particularly in terms of under-representation of minorities in state administration, the judiciary and the police In November 2005, the Parliament adopted legal provisions to implement the CLNM's representation guarantee in State administration with the Law on Civil Service and the Law on Local and Regional Self-Government. This requires state bodies to develop employment strategies for ensuring appropriate levels of minority representation. Minority provisions in these laws, as well as in the Law on Courts and Law on

State Judicial Council of December 2005, basically only mirror the provisions of CLNM without providing for more detailed regulation, however.

As regards political representation, implementation of the CLNM has been more successful. The Parliament already has eight minority MPs and in local and regional assemblies adequate minority representation has been achieved, although clarification is still needed on how minority quotas should be reached, notably though the necessary updating of voters' lists.

In 2006, the CNM received €4million from the State budget for national minority associations, up 22% from the €3.27 million allocated in 2005.

As regards citizenship questions, there has been some progress. As an alternative to the extension of the deadline for applications to reconfirm the status of permanent residence based on Article 115 of the Law on Foreigners, a protocol has been signed between the Ministry of Interior and the Ministry of the Sea, Tourism, Transport and Development allowing the renewal of the status of permanent residence on humanitarian grounds bases on the Article 47 the Law on Foreigners. Seven cases have been resolved on this new basis.

Some progress is being made as regards education of minorities. The Ministry of Science, Education and Sport recently established a separate department in charge of minority education. Special advisor posts were also created to function as a link between the Ministry, local school authorities and minority communities. Education in Eastern Slavonia is being provided for the Serb minority language and script in line with Croatia's obligations under the Erdut Agreement Some progress was made in Vukovar to tackle the issue of timetabling sometimes limiting possibilities for children to spend breaks together.

However, a number of issues need to be addressed. The political will to develop a long-term strategy to implement the CLNM's minority employment provisions is lacking, although some statistics on which to build a strategy are becoming available[3]. Concrete action is now required to develop recruitment plans at all levels of state administration and, to set up civil servants registry to allow for systematic statistics collection. The Government needs to issue clear instructions on how to proceed. The establishment of an action plan covering all bodies concerned by the CLNM is recommended to ensure the CLNM can be fully implemented.

Following regional seminars of Local Councils of National Minorities in December 2005 run by the State Council for National Minorities (CNM), it emerged that the capacity of CNMs to advise local government in relation to minority issues- as outlined in the CLNM- continues to go unrecognised by the majority of local authorities. Progress was noted in Eastern Slavonia and some urban areas, especially Zagreb, but overall CNMs, of which 274 have been elected to date, lack a clear understanding of their role and struggle to obtain premises and basic funding. It was noted that the local authorities need to institutionalise their relations with CNMs. It was also suggested that Government efforts in this direction would be beneficial ahead of the next CNM election in early 2007.

---

[3]     Croatian Government estimates suggest minorities make up 4% of the civil servants at central government level, and around 4.5% of those working in courts and prosecutors offices. They also point to an under representation of minorities among judicial advisors and trainees, from which judges are usually recruited. There are signs of improvement with regard to the police. Out of the 300 trainees for the position of a police officer with the Basic Police School in 2006, 22 trainees, i.e. 7.3% were members of national minorities. This almost corresponds to the share of minority population, according to the 2001 census (7.5%).

**EN**                                                                       **EN**

National minorities are still generally perceived in the media as separate entities and not as an integral part of society. Negative stereotyping in the press has continued. Provisions of the CLNM that public radio and TV stations at national and local level have to produce and/or broadcast programmes for minorities in their languages continue to be implemented at a slow pace.

Initiatives promoting greater integration, reconciliation and tolerance as well as joint activities within the current system should be further encouraged. Outside Eastern Slavonia minority education is usually on the basis of model C of the European Charter of Regional and Minority Languages. Some practical financial and logistical problems remain with its implementation. There is often a lack of resources for Serbian sections of schools and translation of Croatian books into Serbian is slow.

Bilingual rights are guaranteed by the Constitution in those municipalities and towns where the members of an ethnic minority constitute at least one third of the total population, or when it is prescribed by an international agreement or laid down in the statute of a municipality or town. In the majority of cases these bilingual rights are not exercised.

In relation to the **Serb minority**, there have been mixed developments. Generally, the mood in the country appears to continue to move forward, albeit slowly. Symbolic gestures and positive statements on reconciliation from senior State officials, mutual visits between leaders from both Croatia and Serbia, and events such as the celebration of the 150th anniversary of the birth of the Croatian Serb inventor Nikola Tesla, have contributed towards an improved atmosphere. At the political level, the coalition between HDZ and the Serb party SDSS seems to function well. Existing institutions of the Serb minority (political parties, schools, cultural organisations) generally continue to operate without obstacles. In April 2006, the Council for National Minorities approved the flag of the Serb national minority in Croatia. The flag should be displayed in accordance with the CLNM.

Positive leadership does not always filter down to the rest of society, however, and many problems remain. The number of apparently ethnically motivated attacks against the Serb minority and the Orthodox Church remains similar to last year. In some cases police are intervening more rapidly than before. However, there is still insufficient police investigation and prosecution in relation to such incidents. While top officials have quickly condemned some incidents, notably the Biljane Donje incident in July, there is often an absence of clear statements condemning ethnically motivated incidents when they occur, especially from local politicians and media. Zero tolerance of such incidents is needed so as to help create a climate more accepting of minorities.

There are also still real obstacles to the sustainable return of Serb refugees, such as enduring hostility in certain localities, and remaining housing concerns, mainly those involving former tenancy rights holders (*see below*). Serbs, including those who remained in Croatia during the war, face major difficulties regarding access to employment, especially in the war affected areas. Discrimination continues in access to employment, particularly in the public sector. A comprehensive anti-discrimination strategy has yet to be developed and implemented. Despite the progress made, more needs to be done in terms of tackling ethnic bias in the area of war crimes.

The position of the **Roma minority** in Croatia is slowly improving. The Government is taking this issue much more seriously and a more positive attitude within the administration is slowly appearing. The Government has appointed a special advisor for Roma in the national

**EN**                          12                          **EN**

Employment office, as well as in the Ministry of Science, Education and Sports. Progress is being made on the pre-school education of Roma under the government's action plan for the "Decade of Roma Inclusion 2005-2015". Funding is also increasing substantially, mainly in the context of co-financing EC projects.

Overall implementation of the action plan needs to be speeded up. Funding is still not adequate for addressing the challenges of the action plan if real improvements in the Roma's position are to be achieved. Most Roma remain excluded from mainstream Croatian society. Unemployment remains endemic. Recent research indicates that of those Roma aged 15 and over, only 18% are employed and 32% have no schooling. Many are illiterate. Discrimination of Roma in Croatia continues, whether in terms of access to employment, in schooling, or in general attitudes in society. Many obstacles still exist, especially at grass roots level with various efforts aimed at desegregation often met by opposition from the parents of non-Roma children. There is also a continued unwillingness or inability of some local authorities to finance Roma programs. Coordination among Roma groups is weak and they do not have the expertise needed for effective implementation of programmes.

### 2.3.    Regional issues and international obligations

Overall, compliance with the **Dayton/Paris** and **Erdut Peace Agreements** has been ensured.

It was established on 3 October 2005 that Croatia was fully cooperating with the **International Criminal Tribunal for the former Yugoslavia (ICTY)**. There continue to be no particular difficulties to report in terms of ICTY's access to internal documentation, ability to interview potential witnesses and cooperation with the relevant Croatian authorities on ongoing cases. Following the arrest of Ante Gotovina on 7 December 2005 in Spain, the last remaining fugitive indictee from Croatia was transferred to The Hague. In June 2006, ICTY granted a motion by the Prosecution to join the Gotovina case with the cases against Generals Cermak and Markac, also charged with war crimes against Serb civilians during and after the Croatian military operation 'Storm'. The Croatian Government has requested to act as amicus curiae in this case, as well as in the trial against six Bosnian Croats Both requests have been rejected.

The ICTY Prosecution has also asked for a revision of the appeal verdict in the Tihomir Blaskic case following the discovery of an unabridged version of a Croatian Ministry of Interior report on the crimes in Ahmici which sheds further light on this case. Charges of contempt of the Tribunal were levied against four Croatian journalists, three of which have been convicted. All four were indicted for violation of orders of the Tribunal protecting the identity and testimony of protected witnesses.

The case against Rahim Ademi and Mirko Norac, transferred from ICTY to Croatian jurisdiction in September 2005, has still not got underway. After more than one year, no domestic charges have been levied, highlighting difficulties in transposing ICTY charges into domestic law. No other indictments have been transferred. Some witnesses in the Ademi/Norac case refuse to participate in Croatian proceedings given security concerns, citing the incident in late 2005 when the HSP mayor of Osijek publicly read out a list of potential witnesses in an important war crimes case. In this context, security guarantees for witnesses and informants as well as investigative materials are of paramount importance. Some limited training measures for the four County Courts designated for the purpose of trying transferred cases have continued.

**EN**                                                13                                                **EN**

In July, senior government ministers and local politicians attended the opening of a night club in Zadar owned by a company under investigation in the framework of the Government' action plan of April 2005 to locate Ante Gotovina. In August, Hrvoje Petrac, convicted in absentia for kidnap and implicated in the Gotovina support network, was extradited to Croatia. His retrial started in September. Croatia needs to take advantage of its work under the action plan to better tackle organised crime.

Since the arrest of Ante Gotovina, the Croatian Government has indicated its willingness to support his defence, and various local authorities have also contributed financially to a fund established for the same purpose. It is perhaps indicative of the general mood that little is said in public discourse about the need to establish the truth about who is responsible for the crimes for which Ante Gotovina and other Croatian generals are indicted. As elsewhere in the region, the general public does not have easy access to objective information about the work of the ICTY.

As regards domestic prosecutions, Croatia has also been active in trying **war crimes** cases on its own initiative. There has been progress in tackling the hitherto persistent ethnic bias against Serbs in domestic war crimes prosecutions in Croatia. The Chief Prosecutor has further reduced the list of outstanding indictments against Serbs by removing many unfounded cases; and a willingness to prosecute Croats for war crimes is slowly increasing, the most notable case recently being the war crimes charges brought against independent MP and Chairman of the Osijek City Council Branimir Glavas[4]. However, the trial is facing certain difficulties. In view of concerns about witness intimidation and the publication of witness testimony by the accused, the Prosecution requested the detention of this person on three occasions. The third request was granted and following the lifting of his parliamentary immunity, he was taken into custody.

The retrial at Split County Court of the Lora case is generally considered to have been well run and led in March 2006 to the conviction of all eight former Croatian military policemen for war crimes against Serb prisoners of war. The court continued however with the practice of taking into consideration as mitigating circumstances the defendants' active involvement in the war. Three of those convicted are still at large. There has been some progress on international cooperation between State Prosecutors on war crimes. Important agreements have been reached between the Croatian State Prosecutor and his Serbian and Montenegrin counterparts respectively to allow war crimes suspects to be tried in their countries of residence. Such cooperation needs to be intensified and widened geographically. In July 2006, the Criminal Procedure Code (CPC) was amended to allow the possibility of using video-link testimony in Croatia from witnesses in third countries.

Many cases of war crimes in Croatia remain unprosecuted, however. A systematic mechanism for resolving and ending ethnic bias by ensuring application of a uniform standard of criminal responsibility has not been developed. Some problems persist as regards quality of the defence provided by court-appointed counsel. Also, to date it appears that nobody has been prosecuted in Croatia in connection with aiding fugitive indictees nor does it appear that

---

[4]    The events in Osijek in 1991 were allegedly one of the most severe cases of organised killing of civilians in Croatia committed by the Croatian side. So far, these crimes have largely never been prosecuted. In this case the State Prosecutor has requested for the first time that the trial be conducted at another court (Zagreb), outside the place were the crimes happened.

anybody has been prosecuted for aiding in the removal of traces of war crimes, nor for intimidating witnesses or revealing the identity of a protected witness.

A number of other issues hindering the prosecution of war crimes remain open, such as difficulties with the extradition of one State's nationals to the jurisdiction of another and obstacles to the transfer of individual cases between jurisdictions where the more serious crimes are concerned.

While the issue of witness protection is being tackled seriously by the State Prosecutor, this issue is not being addressed sufficiently in the wider judicial system. . Witnesses, particularly those called to testify against members of the Croatian army, still face intimidation, and there is a reluctance to turn to the police among potential witnesses, especially minorities. To ensure integrity of the judicial process, protection for witnesses should be extended beyond the trial period, to informants, or other sources of information in the pre-trial or investigative phase.

Croatia has not signed a bilateral agreement with the USA concerning the non-surrender of certain persons to the **International Criminal Court** and continues to support the EU position on this matter.

Regarding **refugees**, the total number of Croatian Serbs registered as returnees to Croatia is 126,573 or about one third of the 370,000 who left the country during the war. Around 5,000 have returned over the past year. Estimates point to a sustainability rate of return of around 60-70%. Following a re-registration exercise in 2005, there are now 78,415 refugees from Croatia in Serbia, 2,239 in Montenegro and in 7,566 in Bosnia and Herzegovina. The issue of displaced persons has largely been resolved; with 4,192 in Croatia by August 2006.

Although there have been some positive developments, there has been little change in terms of the difficulties returning refugees face, with access to housing and employment as well as convalidation remaining the main concerns. As regards public infrastructure in certain return villages there has been significant progress; budgets have been increased and a Task Force Group (TFG) on re-electrification of minority settlements has been created, including the international community and Serb representatives. Mine clearance operations, while still under funded, have continued and are planned to be completed by 2010. In terms of economic reintegration, measures for the economic development of the areas of return are in place but there are no specific measures targeted at returnees.

The main housing problem for refugees remains the extremely slow implementation of *housing care programmes* within and outside the Areas of Special State Concern (ASSC) for those *former tenancy right holders* who wish to return.

Inside the ASSC 7,496 requests were received in total, of which 2,859 (38%) had been allocated an apartment by July 2006. 4,615 requests have not been processed yet, only about 824 cases less than 1 year ago. Of the pending requests, 1,422 families are already living in the apartment waiting for confirmation. For 3,193 applicants (42%), apartments or other models of housing care have to be provided. Outside the ASSC 4,468 requests were received, of which 2,220 for rent and 2,248 for purchase. To date, 50 apartments (1%) have been purchased of which 40 have been physically handed over and 222 administrative decision have been taken (4%). It is disappointing that almost three years after its adoption, the only major remaining housing scheme remains at a very early stage of implementation: very few apartments have been allocated and the vast majority of requests have not been processed administratively. It is a matter of concern that even the relatively limited funding currently available from 2005 and 2006 is not yet being spent.

**EN**                                                    15                                                    **EN**

In September 2006 the Croatian Government adopted a new five year plan estimated at €450 million for the construction of 3,600 and the purchase of 400 apartments to cater for the outstanding applications outside the ASSC. The Government has announced that special measures will be adopted aiming at preventing the ghettoisation of the housing care applicants. While it is positive that a clear financial envelope has been identified, the plan is based on an untested public/private partnership model. The plan raises a number of other concerns. The government's completion deadline of 2011 is unambitious, especially taking into account the delays which have already occurred and the target deadline of 2008/09 under the existing programme. It is also unclear how the transition from the existing Housing Care programme to the new plan will function. There have been conflicting signals sent publicly as regards the option to purchase apartments at favourable rates and on the rules of inheritability of the protected lease. The changes made and the continued resistance of some local authorities have reinforced the impression that the authorities are not serious about implementing the commitments made. Confidence of potential returnees in the process hasneeds to be raised.

Political will is clearly needed for urgent action both at national and local level if the housing care programmes are not to remain largely an empty promise. Consideration should be given to accelerating plans for completing implementation.

The situation concerning *reconstruction* of housing has continued to improve. To date, the Government has reconstructed over 140,000 out of the 200,000 destroyed houses and apartments, up around 10,000 units. By the end of July 2006, 2,630 houses remained to be finalised from the 2006 programme and another 2,000 from the 2007 programme. 2,129 requests were not yet processed and there were 13,882 pending appeals. Those who receive a negative decision due to "no residence 1991" are now entitled to receive building material to enable self repair. It is expected that all pending requests will be processed by the end of this year. The reconstruction programme is scheduled to be finalised by mid 2007. Outstanding cases should be treated expediently and particular care taken that negative eligibility decisions are properly grounded.

Only a relatively small number of the 20,000 or so houses that had been occupied remain to be *repossessed* and handed over to their rightful owners. There has been little progress with these remaining cases, however. 18 houses were still occupied at the end of August 2006 and 80 cases were waiting for a court decision, implying little movement since last year. A number of problems linked to repossession also remain. As regards damage/looting by the temporary occupant or third persons, a repair programme for 396 households has been put in place, the implementation of which has now started. A number of cases are before the courts where the returnee before repossessing his property is faced with substantial claims for unsolicited investments made in his absence. The Government has still not issued a foreseen decree on this issue based on extra-judicial settlements. There remains a backlog in payment of compensation to owners for delays in repossessing their property.

The recognition or "convalidation" of working years during the "Republika Srpska Krajina" (RSK) is still an outstanding issue. This convalidation is necessary to assure pension rights. While accepting the principle that working years should be convalidated, the Government has not reopened the original deadline of 1999, as called for in the accession partnership, for the many potential beneficiaries who could not reasonably have been expected to apply by then a large number of whom were, and still are, abroad.

**EN**

**EN**

There has been continued, but slower than expected, progress on regional cooperation and implementation of the Sarajevo Declaration aimed at closing the refugee file by the end of 2006. Three Task Force meetings were held and one Ministerial meeting, serving to reduce the number of open issues to two: convalidation and how to deal with lost OTR for those who do not wish to return. Croatia has presented a new roadmap with benchmarks and budgetary allocations. Not all road maps have been finalised, however, and no joint implementation matrix has been drawn up. Implementation of existing commitments needs to continue and a way forward on the convalidation issue found. The Governments concerned should identify a mechanism for addressing the OTR question so that a solution can be found sooner rather than later.

As regards **regional cooperation**, a number of important bilateral visits, agreements and further engagement by Croatia in regional initiatives have contributed towards the aim of further improvement of relations between Croatia and its neighbours. Regional cooperation and good neighbourly relations forms an essential part of the process of moving towards the European Union.

Croatia is an active participant in regional initiatives such as the Stability Pact, the South East Europe Cooperation Process (SEECP), Central European Free Trade Agreement (CEFTA), the Central European Initiative, and the Adriatic Ionian Initiative. Croatia is presently chairing the SEECP. It is committed to the establishment of the Regional Cooperation Council. It is a party to the Energy Community Treaty that entered into force in July 2006 and a signatory of the June 2006 agreement on the European Common Aviation Area.

Croatia is participating in the negotiations for establishing a single regional Free Trade Agreement, based on an enlarged and amended CEFTA. It has concluded bilateral free trade agreements with all South East European countries. In September 2006 it signed a free trade agreement with Kosovo.

Progress towards finding definitive solutions on outstanding border issues has been limited, as has implementation of the Succession Agreement on SFRY and efforts aimed at reconciliation among citizens in the region

**Bilateral relations** with *Serbia* have continued to improve, building on the cautious normalisation of relations over the past couple of years. Further important high level visits have taken place and trade and investment is increasing. In July 2006, the two countries' Prime Ministers opened a renovated border crossing. A provisional visa free regime is in place, with a recent proposal by Croatia to make this arrangement permanent. A number of important open issues remain however to be resolved. There has been no progress with border demarcation at the Danube river. Other open matters include property related issues, refugee return, missing persons and Croatia's claim for compensation for war damage.

The stance of Croatia towards the *Kosovo* issue continued to be fully aligned with the position of the international community throughout the initial phase of the status negotiations.

The Croatian government recognised *Montenegro* as a sovereign and independent state in June 2006 and established diplomatic relations in July. Outstanding issues concern property, refugees and missing persons. Border demarcation at Prevlaka is still outstanding, although the temporary border regime seems to be running smoothly.

**EN**

**EN**

Relations with *Bosnia and Herzegovina* remain relatively stable. Bilateral contacts continue to increase. Main issues concern unresolved border, refugee and property questions as well as trade. Ratification of the 2005 agreement on demarcation of the land and river borders is on hold due to Croatian concerns about the status of islets near Neum. There is also a continued lack of progress on the Port of Ploce issue, on which Croatia has not submitted a new proposal for an Agreement. Discussion on the Peljesac bridge project and possible technical solutions which might allow sufficient access for BiH to the open sea are on-going.

Relations with *Slovenia*, while generally well developed, continue to be affected periodically by difficulties linked to outstanding border issues. On issues such as the maritime and land borders, on Ljubljanska Banka, and on implementing rules for the fisheries aspects of the Border Traffic and Cooperation Agreement, there is no momentum towards reaching permanent solutions.

Relations with *Italy* are good. Relations were affected over the last year by the difficulties faced by Italian citizens in purchasing real estate in Croatia. However, this issue has now been solved though mutual confirmation that reciprocity applies. Croatia continues to have good relations with the *former Yugoslav Republic of Macedonia* and with *Hungary*.

## 3.    ECONOMIC CRITERIA

### 3.1.    Introduction

In examining the economic developments in Croatia, the Commission's approach was guided by the conclusions of the European Council in Copenhagen in June 1993, which stated that membership of the Union requires the existence of a functioning market economy, and the capacity to cope with competitive pressure and market forces within the Union.

### 3.2.    Assessment in terms of the Copenhagen criteria

#### 3.2.1.    *The existence of a functioning market economy*

*Economic policy essentials*

The second Pre-accession Economic Programme (PEP) was submitted by the authorities in December 2005. It sets out a generally sound medium-term macroeconomic framework and an ambitious structural reform agenda. A National Development Strategy with a strong economic reform orientation was launched for public consultation in May and adopted by the government in August 2006. Cooperation with the International Monetary Fund (IMF) and the World Bank has continued to be an important anchor for economic policies. However, the authorities have decided not to request an IMF successor programme when the current arrangement expires in November 2006. At times, poor communication and coordination between various line ministries and agencies have undermined the quality of economic policy making. Strong vested interests have also led to delays in the implementation of important economic reforms. Overall, consensus on the direction of economic policy has generally been maintained, but intergovernmental communication and coordination needs to be strengthened.

*Macroeconomic stability*

In 2005, real GDP growth was 4.3%, up from 3.8% in 2004, mainly driven by domestic demand. Net exports added only 0.1 percentage points to real growth. In the first half of 2006,

real GDP accelerated further to 4.8% year-on-year, largely due to stronger private investment. Economic activity in the third quarter of 2006 remained strong. In the eight months to August 2006, industrial production rose by 4.1% year on year, as compared to an annual average growth of 3.2% in the first half of the year. Average per-capita income further increased to an estimated 47% of the EU-25 average (in purchasing power standards) in 2005. Overall, economic growth continued on the back of stronger private investment.

The current account deficit widened from 5% of GDP in 2004 to 6.4% in 2005 and further to 7.7%[5] in the second quarter of 2006. This was mainly a result of higher oil prices, continued strong imports as well as higher net factor payments to non-residents in early 2006. A large deficit in merchandise trade in the twelve months to end-June 2006 (24.8% of GDP) was not fully compensated for by the surplus in services (16.8%). In the same period, net foreign direct investment (FDI) grew to 4.6% of GDP and covered 60% of the current account deficit. FDI were largely driven by capital increases and takeovers rather than by privatisation or greenfield investments. Due to strong capital inflows, official foreign exchange reserves increased 27.1% year on year at end-July 2006. External debt continued to grow, although at a slower pace than, from € 24.1 billion at end-September 2005 26.8 billion by end-August 2006. At the end of 2005, external debt amounted to 82.6% of GDP, up from 80.2% at end-2004, and continued growing to 86.7% of 2005 GDP by August 2006. Overall, external deficits have widened further.

The officially registered unemployment rate has continued to decline to 15.7% in July 2006 compared to 16.9% in the same month a year earlier. The downward trend is confirmed by the most recent labour force survey. It recorded a decline in the unemployment rate from 13.8% in the second half of 2004 to 12.3% in the second half of 2005. According to official data, total employment grew by a small 0.6% year-on-year in April. Data of the Pension Insurance Fund suggest a stronger growth of above 3% in the same period. Still, a relatively high unemployment rate and limited job turnover and job creation remain some of the most pressing economic problems.

The general monetary policy framework of a "managed float" with the primary objective of maintaining price stability has not changed. The Central Bank took a number of measures to contain strong capital inflows through foreign borrowing by commercial banks. It raised the rate of reserve requirements on the net increase in banks' foreign liabilities in three times to 55% in January 2006. It also expanded the basis for calculation. In March 2006, it introduced a special reserve requirement on banks' liabilities arising from the issuance of securities abroad. Despite these measures, credit and money aggregates continued to accelerate. Annual growth of broad money accelerated from 9.3% in September 2005 to 12% in July 2006. Annual domestic credit growth accelerated from 16.7% to 22.2% in the same period. Overall, monetary policy continued to aim at price stability and relied on additional administrative measures to curb capital inflows.

The Central Bank continued to tightly manage the exchange rate vis-à-vis the euro. In 2005 and early 2006, the Kuna remained under appreciation pressure due to strong demand. This resulted from government bond issues, continued capital inflows as well as appreciation expectations generated by the EU accession process. The central bank intervened 10 times in the foreign exchange market between October 2005 and August 2006 to purchase a total of € 860 million from commercial banks. In the twelve months to August 2006, the Kuna

---

[5]     On a four-quarter moving average.

appreciated by 1.4% vis-à-vis the euro, the same pace as in the year 2005. Exchange rate stability remained an important policy objective in the context of a highly euroised financial system.

Average annual consumer price inflation increased significantly from to 2.1% in 2004 to 3.3% in 2005 and to 3.6% in July 2006, resulting from higher prices for energy (oil), transport and food. Annual average core inflation has remained at around 3%. Overall, price stability has been maintained.

Fiscal performance in 2005 has been broadly in line with policy targets set in the PEP 2005 and agreed under the current IMF programme.[6] The general government deficit (ESA 95) fell to 3.9% of GDP in 2005 (2004: 5%). Total revenues grew by 6.9%. VAT has continued to be the main source of revenues. Growth of current spending fell to 6.6% in 2005 (2004: 8%) supported by a moderate growth of wages and social contributions. Capital spending decreased with 13.7% in 2005, adjusting towards a more sustainable level. Strong economic performance has led to favourable fiscal developments in the first half of 2006. The growth of revenues accelerated markedly to 11.4% year-on-year while current spending grew by a moderate 4%. A revised budget with a lower deficit was adopted by Parliament in July 2006. By the end of May 2006, general government debt had grown by 3.6% year-on-year, reaching 41.2% of GDP. Public sector arrears reportedly continued to grow mainly due to financial problems in the health sector. Overall, fiscal consolidation continued on the back of strong revenue growth.

Some important public finance reform measures have been implemented in early 2006 to strengthen tax administration, such as the establishment of a Financial Police and an e-VAT service. Expenditure management has also improved. A reform in health care financing was adopted in July 2006 to address financial difficulties and stop further arrears accumulation. The scope of this reform was less ambitious than initially envisaged and is expected to reap lower fiscal savings than originally planned. The government has started preparatory work on the reform of the social welfare system. This encompasses proposals for consolidating numerous welfare benefits and for simplifying procedures. The reform aims to better target social benefit spending.

However, the timing and scope of this reform remain uncertain as vested interests have lobbied for the exclusion from the reforms of categorical benefits. These benefits count for a large part of social spending. Significant state support to loss-making enterprises continued to put considerable strain on the budget. In June 2006, the government released the first instalment of debt repayments to pensioners, equivalent to around 0.5% of GDP. This required a significant bridge financing as earmarked revenues from privatisation did not materialise as foreseen. The transparency of public debt management remains weak. The inclusion of local governments in fiscal reporting is still partial. Overall, public finance reforms have continued but significant fiscal risks remain.

The stabilisation of the high and still rising external debt has been a key target of macroeconomic policies. Given the limited scope for monetary policy discretion under the circumstances of currency substitution, fiscal policy has continued to play an important role

---

[6]    Deficit figures for the general government reported in the context of the IMF stand-by arrangement and in the PEP 2005 differ due to different methodologies. The IMF uses GFS 1986 (modified accrual basis) and the PEP 2005 applies GFS 2001.

**EN**                                    20                                    **EN**

for macroeconomic adjustment and stabilisation. Fiscal consolidation has reduced financing needs in the public sector and has helped reducing savings-investment balances in the economy. A shift in government borrowing from external to domestic markets was intended to support this process. However, it may have led to crowding out effects and higher financing costs. Fiscal risks, high spending ratios as well as continuously increasing arrears in the public sector remain a concern. In general, the macroeconomic policy mix was largely adequate, but fiscal consolidation needs to be strengthened.

*Free interplay of market forces*

There is some evidence from available business data that the private sector's share in output has risen above earlier estimates of a 60% share. The share of the private sector in total employment increased slightly from 66.2% in 2004 to around 68% in 2005. Overall, state intervention and ownership has remained significant in important industrial sectors, such as in shipbuilding and the steel industry.

Until June 2006, the State Privatisation Fund had offered 55 companies of its portfolio, comprising 48 companies with minority and seven companies with majority state ownership. However, the number was drastically short of the authorities' policy objective reaffirmed in August 2005. The intention was to sell 50% of companies with minority and a third of companies with majority state ownership by June 2006, totalling almost 500 companies. A number of factors have delayed this, such as a generally low commitment from the government as well as legal problems, low investors' interest, and sometimes unrealistic sale conditions. The authorities' intention to draft and adopt a new Privatisation Law, which allows for partial employee ownership, may have also slowed down the process. To conclude, privatisation continued at a significantly slower than envisaged pace.

*Free market entry and exit*

A network of "one-stop-shops" has been established and company registration procedures have been simplified. The average time needed to set up a business has been reduced. The number of newly established companies in the Register of business entities has increased by 15.3% in 2005. At the same time, the number of companies that were eliminated from the Register has declined significantly. As a result, the stock of registered businesses rose by 5% in 2005. Starting and running a business remains hampered by bureaucratic procedures and inefficiencies in administrations and courts. Recently approved amendments to the Bankruptcy Law aim to simplify and accelerate bankruptcy procedures and to enhance the transparency of the process. Overall, company registration procedures have started to improve, but administrative inefficiencies continue to hamper market entry and exit.

*Adequate legal system*

The judicial system has continued to suffer from slow and inefficient court proceedings, poor case management and low administrative and professional capacity. These circumstances may discourage economic actors from taking cases to court and undermine an effective enforcement of creditor and property rights.

*Sufficiently developed financial sector*

The banking sector represented 78.7% of total financial sector assets in 2005 (2004: 81.4%). Banks are mostly privately-owned (95%) and the share of foreign ownership remained high at

**EN**                                              21                                              **EN**

91.3%. In 2005, the number of banks decreased from 37 to 34, which is still relatively high. The degree of market concentration remained moderate, as the five largest banks represented a market share of 75% at the end of 2005 (2004: 74%). The further reduction of the spread between average lending and deposit rates indexed to foreign exchange (from 4.1% in mid-2005 to 3.7% in April 2006) indicates that the current level of concentration has not been an impediment to market competition. The largely privately-owned banking sector remains the key player in the financial sector.

Domestic private credit increased to 65.2% of GDP in 2005, up from 59.8% in 2004. Annual bank credit growth accelerated from 17.9% in October 2005 to 23.5% in July 2006. In 2005, commercial bank lending to households has been growing stronger (20.3%) than lending to enterprises (14.3%), but the growth of lending to both sectors accelerated to around 24% year-on-year in July 2006. The share of non-performing loans has been reduced from 4.4% in 2004 to 4.0% in 2005. However, the banking system continues to be confronted with foreign-exchange induced credit risks arising from un-hedged non-financial sector balances. Overall, financial intermediation through banks continued to expand rapidly.

The share of non-banking financial sector assets in total financial sector assets increased from 18.6% at the end-2004 to 21.3% at end-2005. This was primarily the result of a strong asset growth of pension and investment funds. The shares of other market segments (insurance, leasing, saving cooperatives) have not changed significantly. Bond market capitalisation grew to 15% of GDP by end-2005, supported by a switch of government borrowing from foreign to domestic financial markets. Overall, capital markets continued to play a minor role in financing the economy.

A single supervisory agency for the non-banking sector was established in November 2005. It started its operations in January 2006, but has not yet reached the required staffing level. A recently adopted insurance law still needs to be fully implemented. Overall, there remains scope for the strengthening of non-banking supervision, in particular regarding leasing companies which have become more important in financial intermediation.

3.2.2.    *The capacity to cope with competitive pressure and market forces within the Union*

*Existence of a functioning market economy*

Croatia has generally maintained macroeconomic stability. Relatively low inflation and exchange rate stability have continued to support market mechanisms. However, fiscal and external deficits still pose potential risks to macroeconomic stability.

*Sufficient human and physical capital*

Several measures have been taken concerning the Education Sector Development Plan 2005-2010. These aimed at improving the quality of primary and secondary education as well as of vocational education and training. Ongoing reforms were meant to tackle serious shortcomings, such as outdated curricula, low quality teaching and poor equipments, which apparently takes time. Emphasis has also been put on enhancing the scope and quality of adult education. Life long learning remained at a very low level at 2.3% in 2005 (2004: 2%). Overall, reforms of the education system have continued, but further efforts are needed to increase its efficiency and quality.

The participation rate remained unchanged at around 63% in the second half of 2005. With a view to increasing participation and employment rates, the authorities introduced a new set of active labour market measures in early 2006 related to the National Employment Action Plan. These include more focussed support, training and employment subsidies for young persons without work experience, the long-term unemployed, older persons and other vulnerable groups. The unemployment rate declined by 1.5 percentage points to 12.3% in the second half of 2005. Yet, it remained high at above 30% for the young population. The long-term unemployment rate increased slightly to 7.4% in 2005 (2004: 7.3%). Overall, the economy continued to be affected by a relatively high share of inactive persons.

Gross fixed capital formation (GFCF) continued to grow strongly in 2005 and early 2006. This led to a further increase in the investment ratio to 29% of GDP (2004: 28.6%). Private investment picked up markedly, whereas the share of general government GFCF in GDP declined to 3.9% (2004: 4.5%). Government investment continued to focus on highway construction. The motorway network was extended by 100 kilometres to 800 kilometres in 2005. Net inflows of foreign direct investment (FDI) increased from 2.6% in 2004 to 3.9% in 2005. The financial sector represents the largest share of cumulative FDI inflows (27.9%), followed by manufacturing (23.4%), then telecommunication (16.3%). Banking and other services attracted most of the FDI inflows, thus reflecting a relatively slow pace of privatisation and restructuring in industry. Total spending on research and development has remained relatively high at around 1.1% of GDP. To conclude, the economy has generally benefited from stronger private investment growth.

*Adequate sector and enterprise structure*

Preparations were made for a restructuring strategy of the shipbuilding industry. The government therefore adopted general guidelines and chose an external consultant to assist in elaborating a restructuring programme. However, shipyard restructuring has been on the government's agenda for a long time and little progress has been achieved so far. Privatisation of the first shipyard was planned for 2005, but then postponed. Following an unsuccessful offer in March 2006, the Privatisation Fund reissued a tender for government stakes in the aluminium factory TLM. The government also established a working group to prepare a strategy for the privatisation of some remaining state owned tourist companies in March 2006. In May 2006, the government submitted – with some delay - a programme for the restructuring and privatisation of the steel sector to the Commission. In September, tenders for the sale of two state-owned steel companies were launched. Overall, the restructuring of large state-owned companies has made little progress (*see also chapter 8, competition*).

The liberalisation of the telecommunication industry is well advanced and market competition has particularly increased in the mobile phone sector. Fixed line operators entered the market, but regulation of network access needs to be improved. The sale of remaining government shares in the telecom company has been delayed. This was initially foreseen for June 2006. Restructuring of the railway company has continued and led to moderate staff reductions, resulting in initial improvements in the working ratio. The legal basis for the structural separation of the railway company was established at end-2005. The privatisation of the first three subsidiaries has not advanced, due to unresolved ownership issues and uncertainties about the privatisation model to be applied. The restructuring and liberalisation of the energy sector is still in progress. The sale of some state shares in the oil company INA, announced for June 2006, has been further delayed. Restructuring and privatisation of an electricity company has not started yet. Overall, the reform of network industries has continued.

**EN**

**EN**